**UNITED STATES of America, Appellee,**

v.

**Harvey M. RENVILLE, Appellant.**

No. 85–1003.

United States Court of Appeals, Eighth Circuit.

Submitted June 13, 1985.

Decided Dec. 11, 1985.

Daniel R. Moen, Aberdeen, S.D., for appellant.

Bonnie P. Ulrich, Asst. U.S. Atty., Sioux Falls, S.D., for appellee.

Before LAY, Chief Judge, JOHN R. GIBSON, Circuit Judge, and PHILLIPS,* Senior Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Harvey Renville was convicted by a jury of two counts of sexual abuse of his eleven year old stepdaughter under 18 U.S.C. §§ 13, 1152 (1982), and S.D. Codified Laws Ann. § 22–22–1(5) (1979 & Supp.1983) (amended 1984). Renville raises three contentions on appeal: first, that the acts for which he was convicted, one act each of cunnilingus and anal intercourse with his stepdaughter, are penalized by federal law, 18 U.S.C. § 1153 (1982) (amended 1984), and therefore the Assimilated Crimes Act, 18 U.S.C. § 13, which incorporates the South Dakota rape statute prohibiting these specific acts, is inapplicable; second, that the district court erred in permitting a physician to testify to statements of the victim during an examination identifying Renville as her abuser, under Federal Rule of Evidence 803(4); and third, that the district court erred in permitting a deputy sheriff to testify to statements of the vic-

---

* The Honorable HARRY PHILLIPS, Senior Circuit Judge for the Sixth Circuit, sitting by designation, participated in oral argument and at conference agreed with the vote of the court. However, due to his untimely death, he did not have an opportunity to review this opinion.

tim during an interview identifying Renville as her abuser, under Federal Rule of Evidence 803(24). We affirm the judgment of the district court.[1]

Renville, an Indian, resided with his family on the Sisseton Indian Reservation in South Dakota. At the time of the offense, Renville was employed as a tribal police officer. In March 1982, a detention hearing was held in South Dakota concerning the victim's half-brother, Joe. At the hearing, Joe testified that the victim had admitted to him that she had been sexually abused by Renville. These allegations eventually were referred to Roberts County Deputy Sheriff Holly Butrum, who interviewed the victim to determine whether, as an emergency measure, she should be removed from her home. Deputy Sheriff Butrum testified at trial, over Renville's objection, that during the interview the victim stated that Renville had engaged in anal intercourse with her on several occasions over the past year, and had threatened to harm her if she related the incidents to anyone.

A few weeks later, while in the care of foster parents, the victim was examined by Dr. Clark Likness, a physician specializing in family practice medicine. Dr. Likness testified at trial, again over Renville's objection, that during the examination the victim recounted acts of anal intercourse and cunnilingus performed by Renville.

At trial, the victim recanted her earlier accusations against Renville, and denied having told anyone except Deputy Sheriff Butrum that he was the individual who had abused her. The jury found Renville guilty on both counts. He was sentenced to two concurrent fifteen year terms.

## I.

Renville's principal contention is that the district court lacked subject matter jurisdiction to convict him under the Assimilated Crimes Act (ACA), 18 U.S.C. § 13, which confers jurisdiction only when there is no applicable federal law. He argues that his conduct was punishable under 18 U.S.C. § 1153, which specifically prohibits incest.

The ACA punishes as a federal offense any act or omission which is punished under state law if committed within the state's jurisdiction, as long as the act or omission is "not made punishable by any act of Congress." 18 U.S.C. § 13.[2] The district court held that the ACA incorporated provisions in the South Dakota rape law specifically prohibiting Renville's conduct, and carrying a maximum penalty of fifteen (15) years for each violation.[3] Renville argues that the ACA, and consequently the state rape statute, was inapplicable because his conduct was made punishable by an act of Congress, specifically the Indian Major Crimes Act (IMCA), 18 U.S.C. § 1153, which prohibits incest by an Indian in Indian territory. The IMCA, in turn, defines the crime of incest and sets the punishment for the act by reference to the statutes of the state where the offense was committed. The South Dakota incest statute provides for a maximum sentence of five (5) years for each violation. The issue, therefore, is whether Renville's conduct is punishable under the ACA, through the adoption of the state rape law (with a corresponding fifteen-year sentence), or under

1. The Honorable Donald J. Porter, United States District Court Judge for the District of South Dakota.

2. 18 U.S.C. § 13 provides:
   Whoever within or upon any of the places now existing or hereafter reserved or acquired * * * is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the state, territory, possession, or district in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

3. The ACA is made applicable to the Indian reservation on which these acts took place by 18 U.S.C. § 1152, which provides, with certain exceptions not relevant here, that "[T]he general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States * * * shall extend to Indian country."

the IMCA, through the adoption of the state incest law (with a corresponding five-year maximum sentence).

The IMCA specifically provides that "[I]ncest shall be defined and punished in accordance .with the laws of the State in which such offense was committed as are in force at the time of such offense." 18 U.S.C. § 1153.[4] At the time of the offense, the South Dakota incest statute prohibited an individual fifteen years or older from engaging in "sexual contact" with a person under twenty-one within a specified degree of consanguinity, S.D. Codified Laws Ann. § 22–22–19.1 (Supp.1983);[5] and sexual intercourse between unmarried individuals within a specified degree of consanguinity,

S.D. Codified Laws Ann. § 22–22–19 (1979) (repealed 1984).[6] The Code defines the term "sexual contact" to include "any touching" of certain parts of the body with intent to arouse or gratify either party, but explicitly limits the scope of the statute to "touching, not amounting to rape." S.D. Codified Laws Ann. § 22–22–7.1 (1979 & Supp.1983).[7] The state rape statute prohibits acts of "sexual penetration" committed under a variety of circumstances, including, at the time, where the victim is less than fifteen years of age. § 22–22–1(5). Renville's actions—anal intercourse and cunnilingus—fall squarely and precisely within the Code definition of sexual penetration.[8] Since his stepdaughter was less

4. The relevant portions of 18 U.S.C. § 1153 provided at the time:

> Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnaping, rape, carnal knowledge of any female, not his wife, who has not attained the age of sixteen years, assault with intent to commit rape, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.
>
> As used in this section, the offenses of burglary and incest shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

Congress in 1984 amended the statute by adding involuntary sodomy to the enumeration of offenses to be defined by state law. Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, Title II, § 1009, 98 Stat. 2141.

5. Section 22–22–19.1 provides:

> Any person, fifteen years of age or older, who knowingly engages in sexual contact with another person, other than his spouse,. if that other person is under the age of twenty-one and is within the degree of consanguinity or affinity within which marriages are by the laws of this state declared void is guilty of a Class 5 felony.

6. Section 22–22–19 provided:

> Persons who are not legally married and who are within the degrees of consanguinity within which marriages are by the laws of this

state declared void, and who have sexual intercourse with each other are guilty of incest.

The state criminal code does not define the term "sexual intercourse." It appears to be consistent with the common law definition of the term, which, both parties admit, does not cover Renville's acts.

7. Section 22–22–7.1 provides:

> As used in this chapter, the term, "sexual contact," means any touching, not amounting to rape, of the breasts of a female or the genitalia or anus of any person with the intent to arouse or gratify the sexual desire of either party.

8. Section 22–22–2 · defines "sexual penetration" as used in the rape statute, with exceptions not relevant here, as:

> [A]n act, however slight, of sexual intercourse, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the body or of any object into the genital or anal openings of another person's body.

S.D. Codified Laws Ann. § 22–22–2 (1979 & Supp.1983).

As authoritatively construed by the South Dakota Supreme Court, rape and sexual contact are mutually exclusive conduct. In *State v. Brammer*, 304 N.W.2d 111 (S.D.1981), the defendant was charged under the state rape statute and a statute prohibiting sexual contact identical to § 22–22–19.1, *see supra* note 5, except that it applies regardless of the degree of kinship between the persons involved. *See* S.D.Codified Laws Ann. § 22–22–7 (1979 & Supp.1983). The State Supreme Court, relying primarily on the plain language of the sexual contact statute, held that sexual contact was a "separate and distinct offense," designed to cover the actions of individuals who sexually molested young children without raping them. 304 N.W.2d at 114.

than fifteen years old at the time, Renville's actions constitute rape.

In light of this statutory scheme, we must reject the defendant's contention that his conduct is punishable as incest under federal law. The state incest statute specifically *excludes* conduct "amounting to rape": Renville's conduct, acts of sexual penetration, is punishable under the state rape statute. Therefore, his conduct falls outside the state definition of incest adopted in the IMCA, and thus is not made punishable by federal law,[9] and the ACA applies.

To avoid the plain language of the statute, Renville relies on language in *Williams v. United States*, 327 U.S. 711, 66 S.Ct. 778, 90 L.Ed. 962 (1946). In *Williams*, the defendant, a married white man, had consensual sexual intercourse with an Indian woman over sixteen but under eighteen years of age. The Court held that the defendant could not be prosecuted under the ACA for violating a state statutory rape law, which prohibited sexual intercourse with a woman under eighteen, where a federal law prohibited carnal knowledge of a woman, defined as sexual intercourse with a woman under the age of sixteen. *Id.* at 717, 66 S.Ct. at 781.

Renville argues that the Court held the phrase "any act or thing which is not made [punishable] by any law of Congress" should not be interpreted so narrowly as to refer only to "individual acts of parties," but instead should be read "in a generic sense as referring to acts of a general type or kind." *Id.* at 722, 66 S.Ct. at 783. Thus, he argues, the IMCA provision adopting the state definition of incest reflects Congress' intent to regulate acts of this "general type or kind," a category within which Renville claims his acts fall. Under this construction he is liable, if at all, only under the South Dakota incest statute.

This argument fails for a number of reasons. The Court in *Williams* began by

holding that the ACA did not apply because "the *precise* acts upon which the [defendant's] conviction depend[ed]" had been made penal by federal law (adultery), *id.* at 717, 66 S.Ct. at 781. (emphasis added), and the state offense of which the defendant was convicted under the ACA (statutory rape of a woman under eighteen) had a specific counterpart in the federal criminal code which defined the offense differently (carnal knowledge of a woman under sixteen). *Id.* Once Congress has defined an offense, the Court stated, a state may not enlarge the scope of liability for that offense by applying its own more expansive definition. *Id.* at 723, 66 S.Ct. at 784. In the present case, the precise acts of cunnilingus and anal intercourse which form the basis for Renville's conviction are not prohibited by any federal law, and there is no specific federal statutory counterpart to the provisions in the state rape statute penalizing this conduct. The federal crimes of rape and carnal knowledge of a female are limited to acts of common law sexual intercourse.[10] *See United States v. Smith*, 574 F.2d 988, 990 (9th Cir.1978); *United States v. Bear Ribs*, 562 F.2d 563, 564 n. 2 (8th Cir.1977), *cert. denied*, 434 U.S. 974, 98 S.Ct. 531, 54 L.Ed.2d 465 (1977); *see also* 65 Am.Jur.2d *Rape* § 3 (1972); 75 C.J.S. *Rape* § 8(b) (1952); *see generally* R. Perkins, Criminal Law 154–56 (2d ed. 1969). There is no present concern, therefore, that the state is attempting to redefine and enlarge an offense already punished under federal law.

Moreover, we believe that Renville has misconstrued the meaning of the Court's statement that the ACA must be interpreted as referring "in a generic sense * * * to acts of a general type and kind." The language appears in the Court's discussion of a 1909 amendment to the ACA's exception clause changing the phrase "[any] offense" which was not prohibited or punished by federal law, to "any act or omis-

---

9. The defendant does not contend that his conduct is made punishable by any other federal law. *See infra* note 10.

10. The defendant does not argue, nor could he, that these offenses precisely or generically cover the conduct for which he was convicted, oral and anal intercourse.

sion" not penalized by federal law. *Id.* 327 U.S. at 722–23, 66 S.Ct. at 783–84. The word "offense" was changed, the Court concluded, because it inappropriately suggested that Congress did not intend the exception to apply to an action which had not been specifically prohibited, and hence could not technically be an "offense." *Id.* at 722 & n. 24, 66 S.Ct. at 784 & n. 24.

The context makes clear that the Court was not holding that the existence of a federal offense bars resort under the ACA to all state statutes which penalize conduct related in any way to the conduct penalized under the federal offense. The Court held only that the semantic change was not intended to bring within the ambit of the ACA state statutes which penalized conduct that Congress had specifically decided *should not* be punished by the federal offense. That is, Congress, in the course of defining an offense, sets the limits on the scope of liability for that offense. As the Court stated, "the new words * * * cannot * * * be regarded as changing the scope of the [ACA] so substantially as to make it amend and enlarge the definition of an existing federal offense as well as to cover the case where an 'offense' had not been prohibited." *Id.* at 722–23, 66 S.Ct. at 783–84.

Moreover, the Court noted that the legislative history of the federal criminal code revealed "an increasing purpose by Congress to cover rape and all related offenses fully with penal legislation." *Id.* at 724, 66 S.Ct. at 784. Thus, Congress had over the years "covered the field with uniform federal legislation * * *." *Id.* Congress had chosen to penalize sexual intercourse between a man and a woman under sixteen; the ACA could not pick up a state statute which enlarged the scope of criminal liability by penalizing intercourse between a man and a woman under eighteen.

Finally, we note that the term "generic" is not self-limiting, and as applied to a broad variety of acts punished by the federal criminal code, it is not immediately apparent where one draws lines to neatly cabin behavior into discrete classes and types.

In light of *Williams*, we cannot accept Renville's claim that sexual contact or common law sexual intercourse is the same generic conduct as the acts of sexual penetration in this case. They are simply different acts. The Court in *Williams* barred the government from resorting to state law to expand the scope of liability for a specific act by redefining the set of individuals liable for engaging in the act. The two South Dakota statutes simply do not stand in that relationship; they prohibit different conduct. *See United States v. Smith*, 574 F.2d 988 (9th Cir.) (federal rape statute which prohibits common law sexual intercourse with a female by force or threat of force does not bar application under the ACA of a Washington sodomy statute), *cert. denied*, 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 156 (1978); *United States v. Butler*, 541 F.2d 730 (8th Cir.1976) (federal statute prohibiting receipt, possession or transport in commerce of firearm by a felon regulates same generic conduct as South Dakota statute prohibiting possession of firearm by felon).

We are not confronted, as were the courts in *Williams* and *Butler*, with a state statute that defines more broadly or narrowly an offense covered by federal law. In such a circumstance, an inquiry into "generic" conduct is relevant. The case before us, on the other hand, is one where the IMCA adopts the state law definition and punishment of a particular offense, here incest, and our task is simply to determine the scope of that offense under the state law. We cannot adopt Renville's argument that his conduct, specifically excluded from the incest statute, must be brought back within the statute because it involved a family member.

## II.

Renville next contends, assuming the district court had jurisdiction, that it erred in permitting a physician, Dr. Likness, to testify to statements by the victim during his examination identifying Renville as her abuser. Specifically, the defendant argues that the hearsay exception found in Federal

Rule of Evidence 803(4) does not encompass statements of fault or identity made to medical personnel.

Rule 803(4) admits as an exception to the hearsay rule:

Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Fed.R.Evid. 803(4). The crucial question under the rule is whether the out-of-court statement of the declarant was "reasonably pertinent" to diagnosis or treatment. In *United States v. Iron Shell*, 633 F.2d 77 (8th Cir.1980), *cert. denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981), this court set forth a two-part test for the admissibility of hearsay statements under rule 803(4): first, the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and second, the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis. *Id.* at 84. *See also Roberts v. Hollocher*, 664 F.2d 200, 204 (8th Cir.1981). The test reflects the twin policy justifications advanced to support the rule. First, it is assumed that a patient has a strong motive to speak truthfully and accurately because the treatment or diagnosis will depend in part upon the information conveyed. The declarant's motive thus provides a sufficient guarantee of trustworthiness to permit an exception to the hearsay rule. *Iron Shell*, 633 F.2d at 84. Second, we have recognized that "a fact reliable enough to serve as the basis for a diagnosis is also reliable enough to escape hearsay proscription." *Id.* (quoting 4 J. Weinstein & M. Berger, *Weinstein's Evidence* § 803(4) [01], at 803–129 (1979)). *Cf.* Fed.R.Evid. 703 (facts of a type reasonably relied on by experts in a particular field to form an opinion are admissible).

The court in *Iron Shell* recognized, however, that a declarant's statements relating the identity of the individual allegedly responsible for his injuries or condition "would seldom, if ever," be reasonably pertinent to treatment or diagnosis. 633 F.2d at 84. *See also United States v. Nick*, 604 F.2d 1199, 1201–02 (9th Cir.1979). The court relied in part on the advisory committee notes to rule 803(4), which conclude that statements of fault ordinarily are not admissible under the rule. The notes suggest, as an example, that "a patient's statement that he was struck by an automobile would qualify, but not his statement that the car was driven through a red light." Fed.R.Evid. 803(4) advisory committee note (quoted in *Iron Shell*, 633 F.2d at 84 n. 10). *See also United States v. Narciso*, 446 F.Supp. 252, 289 (E.D.Mich.1977) (statement by a patient he was shot would be admissible but not a statement he was shot by a white man). Statements of fault generally meet neither criterion for admission set forth in *Iron Shell*. Statements of identity seldom are made to promote effective treatment; the patient has no sincere desire to frankly account for fault because it is generally irrelevant to an anticipated course of treatment. Additionally, physicians rarely have any reason to rely on statements of identity in treating or diagnosing a patient. These statements are simply irrelevant in the calculus in devising a program of effective treatment.

The court in *Iron Shell* and the Advisory Committee used words of generality, however, not exclusion. *Iron Shell*, 633 F.2d at 84 (statements of fault "would seldom" be pertinent); Fed.R.Evid. 803(4) advisory committee notes (statements of fault "not ordinarily admissible"). We believe that a statement by a child abuse victim that the abuser is a member of the victim's immediate household presents a sufficiently different case from that envisaged by the drafters of rule 803(4) that it should not fall under the general rule. Statements by a child abuse victim to a physician during an examination that the abuser is a member of the victim's immediate household *are* reasonably pertinent to treatment.

Statements of this kind differ from the statements of fault identified by the Rules

Advisory Committee and properly excluded under our past decisions in a crucial way: they are reasonably relied on by a physician in treatment or diagnosis. First, child abuse involves more than physical injury; the physician must be attentive to treating the emotional and psychological injuries which accompany this crime.[11] *See People v. Oldsen,* 697 P.2d 787, 788 (Colo.App. 1984), *cert. granted,* (Colo. April 1, 1985); *People v. Wilkins,* 134 Mich.App. 39, 43–44, 349 N.W.2d 815, 817 (1984); *Goldade v. State,* 674 P.2d 721, 725 (Wyo.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3539, 82 L.Ed.2d 844 (1984). The exact nature and extent of the psychological problems which ensue from child abuse often depend on the identity of the abuser.[12] The general rule banning statements of fault is premised on the assumption that the injury is purely somatic. This is evident from the examples put forth by the courts and commentators discussing the rule. *See Stewart v. Baltimore & Ohio Railroad,* 137 F.2d 527, 530

(2d Cir.1943) (fact patient strained himself while operating machine may be significant to treatment but statement by patient that machine defective not); *Narciso,* 446 F.Supp. at 289 (statement of patient he was shot admissible but statement shot by white man not); Fed.R.Evid. 803(4) advisory committee note (patient's statement he was struck by automobile admissible but not statement car driven through red light). *See also Iron Shell,* 633 F.2d at 84 n. 10 (reciting examples set out above); 4 J. Weinstein & M. Berger, *Weinstein's Evidence* § 803(4)[01], at 803–147 n. 17 (1985) (same). In each example, the medical treatment contemplated was restricted to the physical injuries of the victim; there is no psychological component of treatment which could relate to the identity of the individual at fault. Furthermore, in each example the statement of fault is not relevant to prevention of recurrence of the injury. Sexual abuse of children at home presents a wholly different situation.

11. Dr. Likness testified to the importance of diagnosing and treating the psychological injuries that accompany child abuse:

> [T]here is an ongoing emotional trauma, and an emotional trauma that is sometimes extremely hard to define, but it shows up and affects all of those people that have been abused in some way or form. * * * Those are things that don't necessarily show up in a physical exam, but are definitely important in the well being of this child how I then will be able to take care of her in the future, what type of sexual care does she need medically, psychiatrically, and how is it going to affect her life.

Record at 101, *United States v. Renville,* No. 84–10016–01 (D.S.D. Nov. 14, 1984).

12. This point was specifically addressed by Dr. Likness in response to a question by the Assistant United States Attorney:

> Q  What about the identity of the person that did this to [the victim], does that have any significance important for the purpose of your diagnosis and treatment of her?
> A  I think it is extremely important.
> Q  Why is that?
> A  If the perpetrator or the person who is alleged to be the abuser either physically or sexually is someone who is close to her, someone who she lives with, someone who she spends time with and if she can tell me that there have been several incidents of this ongoing, the chances of that to continue [sic] and

> to continue to be a problem is very, very high and the probability that will occur again is definitely there. * * * Again, these children that are abused, 80 percent of the abusers today grew up from being abused. They were abused themselves as children either sexually or physically.

Record at 102.

This point was again made by Dr. Likness in response to a related question inquiring whether the victim's state of mind toward Renville had any significance in determining a diagnosis or course of treatment. Dr. Likness testified:

> [A fear of the defendant] would relate in that it would indicate to me significant problem with her emotional and physical well being, not only at the present time but into the future * * *. [I]f we can get to these children early, if we can help them work though their problems, if we can help them learn to understand what has happened and why and that it is not their fault, they can then hopefully go on to live a fairly healthy life. But, as I said, if we don't get these children and we can't help them, most of them will grow up to be abusers themselves and/or end up with adolescent problems from truancy to breaking the law to sexual deviation on down the line and so it is extremely important for me from a medical point of view to gather as much of that knowledge that I can so that I can then hopefully direct her care down the line for treatment * * *.

Record at 118–119.

Second, physicians have an obligation, imposed by state law, to prevent an abused child from being returned to an environment in which he or she cannot be adequately protected from recurrent abuse.[13] This obligation is most immediate where the abuser is a member of the victim's household, as in the present case. Information that the abuser is a member of the household is therefore "reasonably pertinent" to a course of treatment which includes removing the child from the home.

The defendant contends that our decision in *Iron Shell* holds to the contrary. In *Iron Shell,* this court held that rule 803(4) did not bar the testimony of a physician reciting statements by a nine year old child abuse victim where the child's statements were related to her physical condition and a detailed chronology of the sexual assault, but did not touch on the identity of the assaulting individual. 633 F.2d at 84. The defendant here seizes on language in the opinion, discussed above, that statements by the victim of "who assaulted her * * *, would seldom, if ever," be admissible. *Id.* However, the court in *Iron Shell* considered only the admissibility of a child abuse victim's statements relating the course of events and the conduct of the assailant during the attack; the court did not purport to decide whether statements of fault by child abuse victims are admissible under rule 803(4). Moreover, the defendant in *Iron Shell* was not a member of the victim's household, *id.* at 80–81, and statements relating to identity therefore were not reasonably pertinent to the physician's obligation to insure that the child be removed from an environment in which she was vulnerable to recurring abuse.[14]

■ We therefore believe that statements of identity to a physician by a child sexually abused by a family member are of a type physicians reasonably rely on in composing a diagnosis and course of treatment. Admission of these statements, therefore, is fully consistent with the rationale underlying the second component of the *Iron Shell* test.

Statements of identity in this unique context also meet the first part of the *Iron Shell* test, which focuses on the declarant's motivation for giving the information. *Id.* at 83–84. As we discussed above, this component reflects the premise underlying the rule that the patient's selfish interest in receiving proper treatment guarantees the trustworthiness of the statements. *Id.* Statements of fault traditionally have failed to meet this criterion. Ordinarily, when an individual identifies the person responsible for his injuries or condition, he does so without reasonable expectation that the information will facilitate treatment.

However, this conclusion rests on the obvious assumption that the declarant is responding under the impression that he is being asked to make an accusation that is not relevant to the physician's diagnosis or treatment. This assumption does not hold where the physician makes clear to the victim that the inquiry into the identity of the abuser is important to diagnosis and treatment, and the victim manifests such an understanding. In such circumstances, the victim's motivation to speak truthfully is the same as that which insures reliability when he recounts the chronology of events or details symptoms of somatic distress.

■ We believe these circumstances are present in this case. Before questioning the child, Dr. Likness explained to her that the examination and his prospective questions were necessary to obtain information to treat her and help her overcome any physical and emotional problems which may have been caused by the recurrent

---

**13.** Most states have statutes requiring a physician to report suspected child abuse to the appropriate authorities. *E.g.,* Ark.Stat.Ann. § 42–808 (1977); Iowa Code § 232.69(1)(a) (1985); Mo.Rev.Stat. § 210.115(1) (1983); Minn.Stat. § 626.556(3) (Supp.1985); Neb.Rev.Stat. § 28–711(1) (1979 & Supp.1984); N.D.Cent.Code § 50–25.1–03(1) (1982); S.D.Codified Laws Ann. § 26–10–10 (1984).

**14.** The same reasons serve to distinguish the Ninth Circuit's decision in *United States v. Nick,* 604 F.2d 1199 (9th Cir.1979), on which the defendant relies.

abuse. Record at 94–95. *Cf. Narciso*, 446 F.Supp. at 289 (statement of adult patient identifying drug supplier inadmissible where it was not clear physician communicated to patient he needed to know patient's supplier to find out what medication was given, and not for accusatory purposes). Nothing in the record indicates that the child's motive in making these statements was other than as a patient responding to a physician questioning for prospective treatment. *Iron Shell*, 633 F.2d at 84.

Therefore, we conclude that in the circumstances of this case, there were sufficient indicia of the declarant's proper motivation to ensure the trustworthiness of her statements to the testifying physician. Since the statements are trustworthy, and the type on which physicians reasonably rely in treatment or diagnosis, they meet the criteria for admission set forth in *Iron Shell*. *See* 633 F.2d at 83–84. The district court did not abuse its discretion in admitting the victim's statements to the treating physician identifying her abuser.

### III.

Reville's final contention is that the district court erred in permitting Deputy Sheriff Butrum to testify to statements by the victim identifying him as the abuser. The victim's statements came during the interview Deputy Sheriff Butrum held to determine if emergency removal from the home was necessary. The district court admitted the extra-judicial statements as substantive evidence under the residual, or "catch-all," exception to the hearsay prohibition, rule 803(24). We will reverse the district court only if we find the admission to have been a clear abuse of discretion. *United States v. Poston*, 727 F.2d 734, 739 (8th Cir.), *cert. denied*, 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984); *In Re King Enterprises*, 678 F.2d 73, 77 (8th Cir.1982).

Congress intended that the residual hearsay exception "be used very rarely, and only in exceptional circumstances." *Huff v. White Motor Corp.*, 609 F.2d 286, 291 (7th Cir.1979) (quoting S.Rep. No. 1277, 93d Cong., 2d Sess. 20, *reprinted in* 1974 U.S. Code Cong. & Ad.News 7051, 7065–66). Despite fears that an open-ended exception would admit "too much uncertainty" into the law of evidence, and emasculate the other twenty-three recognized exceptions, Congress added 803(24) in recognition that it could not foresee all possible evidentiary contingencies. Fed.R.Evid. 803(24) advisory committee note. Some flexibility in the rules was necessary to permit courts to admit evidence in exceptional circumstances where the evidence was necessary, highly probative, and carried a guarantee of trustworthiness equivalent to or superior to that which underlies the other recognized exceptions. *United States v. Bailey*, 581 F.2d 341, 346–47 (3d Cir.1978).

We have observed that hearsay evidence must satisfy five criteria to be admissible under 803(24):

(1) The statement must have circumstantial guarantees of trustworthiness equivalent to the twenty-three specified exceptions listed in rule 803;

(2) The statement must be offered as evidence of a material fact;

(3) The statement must be more probative on the point for which it is offered than any other evidence the proponent can procure through reasonable efforts;

(4) The general purposes of the Federal Rules and the interests of justice must best be served by admission of the statement into evidence;

(5) The proponent of the evidence must give the adverse party the notice specified within the rule.

*United States v. Carlson*, 547 F.2d 1346, 1353 n. 3 (8th Cir.1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977). *Accord Huff*, 609 F.2d at 292; *United States v. Mathis*, 559 F.2d 294, 298 (5th Cir.1977).

Renville argues on appeal only that the district court erred in finding that the evidence demonstrated circumstantial guarantees of trustworthiness. That is the only question, therefore, we need address. *United States v. Hinkson*, 632 F.2d 382,

385 (4th Cir.1980). As we have stated in the past, the district court has wide latitude in determining the trustworthiness of an extra-judicial statement. *Carlson,* 547 F.2d at 1354. The record, however, provides no clear statement of the reasoning or findings supporting the admission of the evidence. *See* Fed.R.Evid. 104(a). We must therefore review the record evidence ourselves and attempt "to replicate the exercise of discretion that would be made by a trial judge in making the ruling." *Huff,* 609 F.2d at 291–92.

In assessing the degree of trustworthiness of extra-judicial statements, we must inquire into both the reliability of and necessity for the statement. *Carlson,* 547 F.2d at 1354. As with the other enumerated exceptions to the hearsay rule, the reliability of the declaration is assessed in light of the circumstances at the time of the declaration and the credibility of the declarant. *Huff,* 609 F.2d at 292. *See also United States v. Love,* 592 F.2d 1022, 1027 (8th Cir.1979) (evidence inadmissible given lack of surrounding circumstances indicative of strong propensity for truthfulness).

We believe there are significant indicia of reliability in the present case. Most important, the declarant testified at trial and was subject to cross-examination. She was given an opportunity to explain to the jury why her story had changed. *See United States v. Leslie,* 542 F.2d 285, 290 (5th Cir.1976); *United States v. Iaconetti,* 406 F.Supp. 554, 559 (E.D.N.Y.1976), *aff'd,* 540 F.2d 574 (2d Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977). *See also* 4 J. Weinstein & M. Berger, *supra* p. 15, § 803(24) [01], at 803–377 (courts willing to admit hearsay where declarant available and subject to cross-examination and statement not product of dangers against which hearsay rule seeks to guard). The availability of the declarant at trial vitiates the main concern of the hearsay rule, which is the lack of any opportunity for the adversary to cross-examine the absent declarant. *United States v. Bohr,* 581 F.2d 1294, 1304 (8th Cir.) (citing *Ander-*

*son v. United States,* 417 U.S. 211, 220, 94 S.Ct. 2253, 2260, 41 L.Ed.2d 20 (1974)), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). Where the jury is thus provided with the declarant's in-court testimony and explanation for prior inconsistent statements, the concern with circumstantial guarantees of reliability is lessened. *United States v. McPartlin,* 595 F.2d 1321, 1350–51 (9th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979).

It is also significant that the declarant admitted she made the out-of-court statements to Deputy Sheriff Butrum. *See Carlson,* 547 F.2d at 1354; *Leslie,* 542 F.2d at 290. Although the declarant testified at trial that these earlier statements were lies, this simply provided the jury with a routine question of credibility. As Judge Hand noted many years ago, "If, from all that the jury see of the witness, they conclude that what [she] says now is not the truth, but what [she] said before, they are none the less deciding from what they see and hear of that person and in court." *DiCarlo v. United States,* 6 F.2d 364, 368 (2d Cir.1925). *Cf. Iaconetti,* 406 F.Supp. at 559 (general purposes of rules and interests of justice served where evidence admitted under residual exception to help jury in assessing credibility conflict). This is very much different from a situation in which the declarant testifies in court that she never made earlier inconsistent statements raising concerns of manufactured evidence. *See Hinkson,* 632 F.2d at 386. *Cf. United States v. Sisto,* 534 F.2d 616, 622 (5th Cir.1976) (error not to instruct jury to consider for impeachment purposes only prior inconsistent statement of declarant through government witness where declarant denied making statement and no evidence of statement in writing).

We also believe it is significant that the victim, a child, made almost identical statements accusing Renville and describing the abuse to the numerous state and medical personnel who questioned her, and the foster parents with whom she was temporarily

placed. Although these statements were not related "close on the heels of the criminal event," *Iaconetti,* 406 F.Supp. at 559, they were made soon after the surprise revelation of the abuse at her stepbrother's delinquency hearing. These factors, together with the fact that the statements were made to an appropriate individual, a deputy sheriff, cumulatively "tend to mitigate the risks of insincerity and faulty memory." *Id.*

Finally, we believe that the age of the victim may be a factor guaranteeing the trustworthiness of the declarations. We have held a declarant's young age is a factor that may substantially lessen the degree of skepticism with which we view their motives. *See Roberts v. Hollocher,* 644 F.2d at 205 ("child's age was a factor supporting admissibility and assuring trustworthiness"); *Iron Shell,* 633 F.2d at 84 ("the age of the patient also mitigated against a finding that [the child's] statements are not within the traditional rationale of the rule.").

We also believe that there is a strong need for these statements. The victim was the only one who could identify her abuser. Where she later recanted her prior accusations, it was important for the government to show that she had earlier made a consistent series of accusations naming Renville as her abuser.

We therefore conclude that the extra-judicial statements to Deputy Sheriff Butrum are supported by guarantees of trustworthiness equivalent to those which sanction the other enumerated exceptions to the hearsay rule. The circumstances surrounding these statements "strongly suggest that the declarant's perception, memory, narration and sincerity concerning the matters asserted are trustworthy." *United States v. Friedman,* 593 F.2d 109, 119 (9th Cir.1979). The district court did not abuse its discretion in admitting the testimony under rule 803(24).

We therefore affirm the decision of the district court.