WATERMAN, Justice
(dissenting).
I respectfully dissent. I agree with the court of appeals that the district court properly allowed the emergency room physician and nurse to testify regarding the victim’s identification of Smith, her ex-boyfriend and the father of her child, as her attacker. That information was elicited pursuant to the hospital’s screening protocol to protect patients traumatized by suspected domestic abuse. As the medical community and many other courts have long recognized, identifying the abuser is a key component in treating the patient’s mental and physical injuries and ensuring the patient’s safety. Th'é' majority errs by holding the district court abused its discretion by admitting the testimony under Iowa Rule of Evidence 5.803(4) and misses the opportunity to adopt a categorical rule allowing medical treatment providers to testify regarding a patient’s identification of an intimate partner as the assailant. In my view, our court adopted a categorical rule in child abuse cases, and the rationale easily extends-to adult domestic abuse. I would join the parade of courts adopting a categorical rule. Our application • of this rule of evidence should evolve in response to- the growing understanding and body of medical literature on intimate-partner violence.
Moreover, even if I agreed with the majority that admission of this kind of evidence should occur only on a case-by-case basis, I would find the record here adequate to warrant its admission. The State in this, case laid the requisite foundation for the admission of the evidence under rule 5.803(4). This case is emblematic of the recurring problem in domestic abuse cases — a victim who identifies the attacker while traumatized but then later, controlled by his or her abuser, changes his or her story or refuses to cooperate with the prosecution. I trust Iowa juries to find the truth. In this case, the jury disbelieved the victim’s trial testimony that her injuries resulted from falling off a trampoline and believed what she told her treating physician and nurse the night of her attack.
I would also affirm the district court ruling allowing the physician and nurse to testify as to the victim’s identification of her assailant on an alternative ground the majority understandably declines to reach — the excited-utterance exception to the hearsay rule. • The victim. was still reeling from the assault when she spontaneously identified Smith at the hospital simply when asked what happened to her. We may affirm an evidentiary ruling on any valid alternative ground supported by the record. See DeVoss v. State, 648 N.W.2d 56, 62 (Iowa 2002). The State, however, did not raise that ground in district court or brief it on appeal, and the court of appeals did not reach it as to the emergency -room personnel. The majority appropriately chooses to defer deciding the issue under these circumstances, and nothing in today’s opinion precludes the State from relying on the excited-utterance exception in the second trial.
I. Additional Facts.
The majority’s recitation of the facts is truncated. To put the issues in better context, I will recapitulate what happened to M.D. When police officers responding to her 911 call arrived at her home at 1 a.m., M.D., age twenty-nine, was sitting in her *192 car with her five-year-old daughter arid dog. M.D. was crying, upset, tense, and scared, with visible injuries — a swelling in her arm and around one eye, and scratchés on her shoulder and knees. She initially told police an intruder had jimmied the side door lock and attacked her. She said he called her a “dirty whore,” punched her, knocked her to the floor, and kicked the back of her head repeatedly. She told officers she had blacked out during the attack and thought her' armi was broken. At first she claimed she did not know her assailant. The officers were skeptical because they had previously been summoned to M.D.’s home over an altercation with Trent Daniel Smith, the father of her child.[5] The police persisted in questioning M.D. and urged her to be honest with them. She indicated she was afraid of her attacker and told police, “[Y]ou guys can’t protect me forever.” She then said “Trent Daniel” attacked her. Under further questioning, M.D., who seémed scared, gave Smith’s full name.
The police officers gave M.D. a ride to the emergency room at Allen Memorial Hospital for treatment. When she. arrived, she . was “extremely shaken - up.” Nurse Trisha Knipper asked M.D. what happened and wrote down .that M.D. said she “was assaulted by her baby’s daddy around midnight.” Knipper, pursuant to the hospital’s protocol, asked M.D. screep-ing questions that are asked of every patient who presents with a traumatic injury. M.D. answered that “there was domestic violence going on,” “she was afraid of or threatened by someone close to her,” “she had been physically hurt by her. baby’s dad,” and “she felt as if someone .was taking advantage of her.”
Approximately eleven minutes after being admitted to the emergency room, M.D. spoke "with Dr. Robert Mott.' Dr. Mott asked what happened, and she replied she “was assaulted by the father of her child.” She said she was knocked to the ground and kicked in the head and face multiple times. Dr. Mott noted that she was in a lot of pain and her arm was very tender. No bone fractures were found. M.D. was given antianxiety medication and discharged at 5 a.m.
At .trial eleven . months . later, M.D. changed her story to claim her injuries resulted from .falling off a trampoline. The jury heard the testimony of the emergency room nurse and physician and police that. M.D. had identified Smith as her attacker. The jury convicted Smith of domestic abuse assault and domestic abuse causing bodily .injury. The. court of appeals affirmed his convictions, concluding the district court, properly admitted the testimony of the emergency room physician and nurse under Iowa Rule of Evidence 5.803(4) and that it.was harmless error to admit the police officer’s testimony of M.D.’s identification of Smith under the ; excited-utterance exception, rule 5.803(2). , I would, affirm the decisions of the district court and court of appeals.
II. The Medical. Diagnosis and Treatment Exception.
. The fighting issue is whether the patient’s, identification of her assailant is admissible under the hearsay, exception for
[statements made for purposes of medical diagnosis: .or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the .inception .or .general character of the cause or .external source thereof insofar *193 as reasonably pertinent to diagnosis or treatment.
Iowa R. Evid. 5.803(4). In State v. Tracy, we adopted the Renville two-part test to establish the admissibility of statements under this exception:
[F]irst[,] the declarant’s motive in making the statement must be consistent with the purposes of prompting treatment; and second, the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis.
482 N.W.2d 675, 681 (Iowa 1992) (quoting United States v. Renville, 779 F.2d 430, 436 (8th Cir.1985)). In Renville, the United States Court of Appeals for the Eighth Circuit applied that test to affirm a trial court ruling that admitted a treating physician’s testimony regarding the child abuse victim’s identification of her abuser during a medical examination. 779 F.2d at 438-39. As I show below, our decisions in child abuse cases reach the same conclusion and demonstrate that a domestic abuse victim’s identification of his or her attacker is admissible under this test.
A. M.D.’s Statement Was Reasonably Pertinent to Medical Diagnosis or Treatment. The emergency room nurse, Rnipper, testified that M.D., like- every patient admitted into the emergency room, was asked screening questions under the hospital’s standard protocol. These questions covered topics including domestic violence, suicide, and workplace injuries. M.D.’s responses indicated she had experienced domestic violence. Each response was noted in M.D.’s chart. Knipper testified that she is required to “document complaints and treatment and diagnoses” on a chart for every patient that enters the hospital. The chart is maintained as a reference “for continued care” or “for any other needs that come about.” Knipper’s testimony shows that the documented responses to these standardized questions are used - by the medical community in-crafting a treatment plan and diagnosing the patient. M.D.- replied to the standard questions by identifying Smith. M.D.’s statement was responsive to the questions being asked, and that information can be useful for diagnosis or treatment.
Dr.- Mott’s testimony showed that he considers the patient’s version of what happened to be highly relevant to treatment. Dr. Mott testified 'regarding how he approaches new patients in the emergency room:
Q. And do you try to find' out from the patient what had happened? A.-Absolutely. '
Q. Is that necessary for treating the patient? A. That is key.
When M.D. entered the emergency room, Dr. Mott followed his protocol to determine how to proceed with treatment:
Q. And did you speak with [M.D.] about what had happened? A. I did.
Q. And what did she say occurred?
MS. LAVERTY: Objection.
THE - COURT: Same ruling. Overruled.
Q. You may answer. A. Okay. She said that she was assaulted by the father of her child, was pretty much the first thing that she told me.
Q. And did she explain to you how she was assaulted? A. She stated that she was knocked to the ground. And then once she was on the ground, then she was kicked in the head and the face multiple times.
His medical testimony showed that :M.D.’s explanation of why she came to the emergency room was key- to determine a proper-course of treatment. See Vasconez v. Mills, 651 N.W.2d 48, 56 (Iowa 2002) (noting a doctor “who is called to treat and actually • treats the patient” may testify *194 under the hearsay exception because there is an increased “probability that the patient will not falsify in statements made to his physician at a time when he is expecting and hoping to receive from him medical aid and benefit.” (quoting Devore v. Schaffer, 245 Iowa 1017, 1021, 65 N.W.2d 553, 555 (1954))).
M.D. consistently identified Smith as her attacker to medical personnel that night. That she recanted nearly a year later at trial does not cast doubt on her motives when seeking treatment the night of her attack. See Douglas E. Beloof & Joel Shapiro, Let the Truth Be Told: Proposed Hearsay Exceptions to Admit Domestic Violence Victims’ Out of Court Statements as Substantive Evidence, 11 Colum. J. Gender <& L. 1, 3-4 (2002) (listing reasons why victims recant). The rate of recantation among domestic violence victims has been estimated between eighty and ninety percent. Id.; Lisa Marie De Sanctis, Bridging the Gap Between the Rules of Evidence and Justice for Victims of Domestic Violence, 8 Yale J.L. & Feminism 359, 367 (1996); see also People v. Brown, 33 Cal.4th 892, 16 Cal.Rptr.3d 447, 94 P.3d 574, 576 (2004) (approving the use of expert testimony stating, that “[a]bout 80 to 85 percent of victims ‘actually recant at some point in the process’”); State v. Dority, 50 Kan.App.2d 336, 324 P.3d 1146, 1152 (2014) (noting that a fact finder may use common knowledge that “victims of domestic violence often recant their initial statements to police” (quoting State v. Coppage, 34 Kan.App.2d 776, 124 P.3d 511, 515 (2005))).
Dr. Mott and Knipper treated M.D. for her emotional or psychological response to the attack. She was prescribed antianxiety medication. The hospital’s screening questions do not exist in a vacuum. The questions about domestic abuse are asked for a reason — to allow the treating physicians and nurses to understand what happened and properly conduct follow-up treatment as necessary. In any event, rule 5.803(4) does not condition admissibility on a showing.that the patient’s statements given for medical treatment and diagnosis were actually used for treatment. See State v. Hildreth, 582 N.W.2d 167, 170 (Iowa 1998) (holding medical diagnosis and treatment hearsay exception applies to child ,sex abuse cases because, “the identity of the abuser is a matter that may assist in diagnosis or treatment of an emotional or psychological injury” (emphasis added)). The context in which the identification is made is what matters, not what the treating physician and nurse did with that information.
For these reasons, M.D.’s statements were admissible under the medical diagnosis and treatment hearsay exception.
B. We Should Adopt a Categorical Rule. A categorical rule would be a logical extension of our jurisprudence regarding this hearsay exception’s application to child abuse cases. Our precedents recognize that a statement to a treating physician .by a child identifying his or her abuser is admissible under rule 5.803(4). State v. Tomquist, 600 N.W.2d 301, 306 (Iowa 1999) (holding a child’s “responses in a dialogue initiated for purposes of diagnosis or treatment” for child abuse “may assist in diagnosis or treatment”), overruled on other grounds by State v. DeCamp, 622 N.W.2d 290, 293 (Iowa 2001); Hildreth, 582 N.W.2d at 170 (“[Ascertaining the identity of the [child’s] abuser is a matter that may assist in diagnosis or treatment of an emotional or psychological injury.”); Tracy, 482 N.W.2d at 682 (“Because of the nature of child sexual abuse, the only direct witnesses to the crime will often be the perpetrator and the victim. Consequently, -much of the. State’s proof will necessarily have to be admissible hearsay *195 statements made by the victim to relatives and medical personnel.”); see also. Renville, 779 F.2d at 436 (“Statements by a child abuse victim to a physician during an examination that the abuser is a member of the victim’s immediate household are reasonably pertinent to treatment.”).
In Tracy, we stressed that a child seeking medical treatment will generally lack an improper motive, and the identification of an abuser is reasonably pertinent to medical treatment. 482 N.W.2d at 681. In that case, a minor told her doctor during an examination that she had been sexually abused by her stepfather. Id. We concluded the first requirement is met when “the examining doctor emphasize[s] to the alleged victim the importance of truthful responses in providing treatment” and when the “child’s motive in making the statements [is] consistent with a normal patient/doctor dialogue.” Id.
The second part of the Renville test for admissibility under rule 803(4) requires that the content of the statement be such as is reasonably relied on by a physician in treatment. or diagnosis. Where the alleged abuser is a member of the victim’s immediate household, statements regarding the abuser’s identity are reasonably relied on by a physician in treatment or diagnosis. Since child abuse often involves more than physical injury, the physician must be attentive to treating the emotional and psychological injuries which accompany this offense. To adequately treat these emotional and psychological injuries, the physician will often times need to ascertain-the identity of the abuser.
Id. at 681 (emphasis added) (citations omitted). The same reasoning applies to adult domestic abuse victims.
In Hildreth, A.E., a-minor, made several comments that led her parents to suspect the child had been sexually abused by her babysitter’s son, Steven Hildreth. 582 NW.2d at 168. A.E. was referred to a therapist, who interviewed A.E. about her recollections of the abuse and the identity of her abuser. Id. at 169. The trial court permitted the therapist to testify regarding A.E.’s identification of her abuser at trial. Id. In affirming the trial court ruling, we emphasized that “where a child’s statements are made during a dialogue with a health care professional and are not prompted by concerns extraneous to the patient’s physical or emotional -problem, the first prong of the Renville test is satisfied.” Id. at 170.; We held the second requirement was satisfied because “ascertaining the identity of the abuser is a matter that -may assist in diagnosis or treatment of an emotional or psychological injury.” Id. ■ ■
The justifications expressed in Hildreth and Tracy for a physician treating child abuse parallel a physician treating adult domestic abuse. Regarding the first prong, a domestic violence victim has no motive to .lie to a doctor or nurse. The identification of the abuser is “consistent with a normal patient/doctor dialogue” because standard screening questions elicit this information. See Tracy, 482 N.W.2d at 681. The second requirement is met because, .as with child abuse, doctors must be attentive to treating the emotional and psychological injuries .that accompany domestic violence.
The United States Court of Appeals for the Tenth Circuit recognized these similarities in United States v.Joe and explained why a categorical rule for adult domestic violence logically follows from child abuse jurisprudence: ■
• [T]he identity of the abuser is reasonably- pertinent to treatment in virtually every domestic sexual assault case, even those not involving children. All victims of domestic sexual abuse suffer .emotion *196 al and psychological injuries, the exact nature and extent of which depend on ■the identity of the abuser. The physician generally must know who the abuser was. in order to render proper treatment because the physician’s treatment will necessarily differ when the abuser is a member of the victim’s family or household. In the domestic sexual abuse case, for example, the treating physician may recommend- special therapy or counseling and instruct the victim to remove herself from the dangerous envirompent by leaving the home and seeking shelter elsewhere. In short, the domestic sexual abuser’s identity is admissible under Rule - 803(4) where the abuser has such an intimate relationship with the victim that the abuser’s identity becomes ‘reasonably pertinent’ to the victim’s proper treatment. .
8 F.3d 1488, 1494-95 (10th Cir.1993) (footnote-omitted). I agree,
We should adopt a categorical rule to allow healthcare providers to testify as to the adult domestic abuse victim’s identification of an intimate partner as the assailant. The Louisiana Supreme Court recently surveyed current medical literature and practices to adopt a categorical rule that ■
reflects the current integrated approach to the treatment of domestic violence 'cases in the medical community; See American Medical Association Policy Statement on Family and Intimate Partner Violence H-515.965 Chicago: AMA (2014) (advocating that physicians: (a) • “Routinely inquire about the family violence histories of their patients as this knowledge is essential for effective diagnosis and care;” and (e) “Screen patients for psychiatric sequelae of violence and make appropriate referrals for these conditions upon identifying a his-■1 tory of family or other interpersonal -violence.”) (emphasis added); see also U.S. Dep’t of Health & Human Serv., Screening for Domestic Violence in Health Care Settings (August 2013), Office of the Assistant Secretary for Planning and Evaluation (“Screening and counseling for domestic violence was first institutionalized in 1992 when the Joint Com- - mission on the Accreditation of Hospitals and Health Care Organizations (JCAHO) mandated that emergency departments develop written protocols for identifying and treating .survivors of domestic violence in order to. receive hospital accreditation (Joint Commission, 2009). Since then, many health assoeia- ■ tions have supported screening across health care specialties. The American ■ Medical Association (AMA), American Congress of Obstetrician Gynecologists (ACOG), and the American Nurses Association (ANA) all recommend routine universal screening.”).
State v, Koederitz, 166 So.3d 981, 985-86 (La.2015) (footnote omitted).
Mandatory screening procedures, such as the one used in the emergency room in this case,' recognize the harsh reality that many people are repeatedly victimized by the same person during the domestic abuse cycle. Approximately two-thirds of people — 65.5% of women and 66.2% of men — physically assaulted by an intimate partner are victimized multiple times by the same partner. See Patricia Tjanden & Nancy Thoennes, U.S. Dep’t of Justice, Extent, Nature, and Consequences of Intimate Partner Violence 39 (2000). Domestic violence sürvivors are often caught in cycles of violence that máy persist for years. The average female domestic violence survivor reported the domestic violence cycle involving an intimate' partner lasted over 4.5 years, whereas the average male domestic survivor’s cycle lasted 3.6 years. Id. at 39-40. In consideration of *197 these sobering statistics, we should adopt a per se rule that the identification of the perpetrator- of domestic violence is pertinent to medical diagnosis or treatment, and admissible under rule 803(4).
Other jurisdictions have reached this conclusion and adopted a categorical rule. See Joe, 8 F.3d at 1494-95; Moore v. City of Leeds, 1 So.3d 145, 150 (Ala.Crim.App.2008) (“We believe that the rationale employed by the [Alabama] Supreme Court in [Ex parte C.L.Y., 928 So.2d 1069 (Ala.2005), announcing a categorical rule to admit a child-patient’s identification of their abuser] would also apply to victims of domestic violence.”); Nash v. State, 754 N.E.2d 1021, 1025 (Ind.Ct.App.2001) (“[I]n cases such as the present one where injury occurs as the result- of domestic violence, which .may alter the - course of diagnosis and treatment, trial courts may properly exercise their discretion in admitting statements regarding identity of the perpetrator.”); Koederitz, 166 So.3d at 985-86 (“[W]e see-no principled basis for confining statements of fault under [the medical diagnosis and treatment exception] solely to cases involving domestic .sexual assault, whether of. adults or children, as opposed to other instances of physical assault and abuse taking place in a context that may be fairly described in terms of domestic violence.”); People v. Pham, 118 A.D.3d 1159, 987 N.Y.S.2d 687, 690-91 (2014) (“Details of the abuse, even including the perpetrator’s identity, may be relevant to diagnosis and treatment when the assault occurs within a domestic violence relationship because the medical provider must consider the victim’s safety when creating a discharge plan and gauging the patient’s psychological needs.”); State v. Moen, 309 Or. 45, 786 P.2d 111, 121 (1990) (en banc) (“Admissibility of statements of the type challenged here[ — i.e., a domestic abuse victim identifying her abuser — ]is not limited to cases involving child abuse.”); State v. Bong, No. 33000-1-III, 2015 WL 3819223, at *5 (Wash.Ct,App.2015) (“Although statements attributing fault are generally not relevant to diagnosis or treatment, this court has found statements attributing fault to an abuser in a domestic violence case are an exception because the identity of the abuser -is pertinent and necessary to the victim’s treatment.”); State v. Moses, 129 WashApp. 718, 119 P.3d 906, 911 (2005) (same); Oldman v. State, 998 P.2d 957, 961 (Wyo.2000) (“There is ho logical reason for not applying [the sexual domestic abuse exception in Joe ] to non-sexual, traumatic abuse within a family or household, since sexual abuse is simply a particular kind of physical abuse.”); Commonwealth v. O’Connor, 6 N.M.I. 125, 129. (N.Mar.I.2000) (“[I]n cases of domestic and child abuse ... the identity of the abuser becomes ‘reasonably pertinent to diagnosis or treatment^’] and a statement identifying the abuser is admissible under the medical hearsay exception.”). These decisions are persuasive and should be followed.
The majority concludes there are too many variables in domestic violence cases to adopt a categorical rule, relying on State v. Robinson, without mentioning the Minnesota Supreme Court in that decision expressly left open the possibility it would adopt a' categorical rule for domestic abuse cases in the future. 718 N.W.2d 400, 407 (Minn.2006) (“We do not foreclose the possibility that we might in the future adopt a properly limited categorical rule of admissibility under the medical exception to hearsay for statements of identification by victims of domestic violence.”).
The majority also refers to “the constitutional right of people accused of crimes to be confronted by their accusers,” citing for support State v. Bentley, 739 N.W.2d 296, 300-01 (Iowa 2007). Bentley is nothing like this case.- There, the police inves *198 tigating child abuse arranged a “forensic interview” of the ten-year-old victim who was told at the outset of her interview.-that “a police officer and a DHS representative were listening on the other side of the observation window.” Id. at 300, When the child asked to halt the interview, her interrogator “specifically implored [the victim] to continue because ‘it’s just really important the police know about everything that happened.’ ” Id. The interrogator during breaks consulted with the police officer about additional questions to ask. Id. By contrast, M.D. asked the police to take her to the emergency room for treatment, and the police had no involvement when Dr. Mott and nurse Knipper examined her.
The majority cites no case holding that a statement made to a treating physician or nurse in the emergency room is “testimonial” for purposes of the Confrontation Clause. By definition, a statement made for purposes of medical treatment or diagnosis is not testimonial, as the Louisiana Supreme Court observed: “The statements at issue in the present case are also non-testimonial for purposes of the Sixth Amendment Confrontation Clause because they were not ‘procured [with a] primary purpose of creating an out-of-court substitute for trial testimony.’” Koederitz, 166 So.3d at 986-87 (quoting Michigan v. Bryant, 562 U.S. 344, 358, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93, 107 (2011) (emphasis added)); see Bryant, 562 U.S. at 358-59, 131 S.Ct. at 1155, 179 L.Ed.2d at 107 (“In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as. reliable, will be relevant.”); White v. Illinois, 502 U.S. 346, 356, 112 S.Ct. 736, 743, 116 L.Ed.2d 848, 859 (1992) (“[A] .statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility that a trier of fact may not think replicated by courtroom testimony.”); cf. Melendez-Diaz v. Massachusetts, 557 U.S. 305, 312 n. 2,129 S.Ct. 2527, 2533 n. 2, 174 L.Ed.2d 314, 322 n. 2 (2009) (“[Mjedical reports created for treatment purposes ... would not be testimonial under our decision today.”); Giles v, California, 554 U.S. 353, 376, 128 S.Ct. 2678, 2692-93, 171 L.Ed.2d 488, 505-06 (2008) (“[0]nly testimonial statements are excluded by the Confrontation Clause. Statements to friends and neighbors about abuse and intimidation [by women in abusive relationships], and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules_”). In any event, in this case, M.D., Dr. Mott, and nurse Knipper all testified live at trial subject to cross-examination. The majority’s reference to the Confrontation Clause is a red herring.
III. Excited-Utterance Exception.
Under the DeVoss rule, we may affirm an evidentiary ruling under any valid alternative ground supported in the record. See State v. Newell, 710 N.W.2d 6, 23 (Iowa 2006) (“Although we base bur decision' on a different rationale, we find no reversible error in the trial court’s ruling.”); DeVoss, 648 N.W.2d at 62-63 (noting that evidentiary rulings are an exception to our error preservation requirements arid the district' court ruling will be upheld if sustainable on any ground). In my view, M.D.’s statements to her doctor and nurse identifying Smith as her abuser were admissible under the excited-utterance exception. Iowa R. Evid. 5.803(2).[6]
*199 An excited utterance is “[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.” Id. “[Statements made under the stress of excitement are less likely to involve deception than if made upon reflection or deliberation.” State v. Harper, 770 N.W.2d 316, 819 (Iowa 2009) (quoting State v. Tejeda, 677 N.W.2d 744, 763 (Iowa 2004)). We consider five nonexclusive factors in determining whether a statement qualifies as an excited utterance:
(1) the time lapse between the event and the statement, (2) the extent to which questioning elicited the statements that otherwise would not have been volunteered, (3) the age and condition of the declarant, (4) the characteristics of the event being described, and (5) the subject matter of the statement.
Id. (quoting State v. Atwood, 602 N.W.2d 775, 782 (Iowa 1999)).
Our court considered a similar fact pattern in Atwood. Atwood was charged with vehicular homicide after killing two pedestrians. 602 N.W.2d at 777. Atwood’s passenger, Chris Sivertsen, was hospitalized. Id. at 782. A police officer interviewed Sivertsen approximately two and one-half hours after the accident. Id. The officer spoke with Sivertsen for about four to six minutes. Id. The officer asked Sivertsen what happened, and Sivertsen responded the defendant “jerked the wheel — or steering wheel way too hard and I thought he was mad.” Id. We held the statement was admissible. Id. at 783. We noted that Sivertsen had been through a very traumatic experience; “he had just been involved in a serious car accident and had apparently seen a child hit the windshield.” Id. We did not find that the time-lapse or the officer’s question brought the statement outside the excited-utterance exception. Id. at 782.[7]
The circumstances surrounding M.D.’s statements show her statements to Knip-per and Dr. Mott were excited utterances. M.D. was extremely upset from the time she called 911 through her emergency room visit. She was anxious, in pain, and separated from her daughter in the middle of the night. Against this backdrop, M.D. twice identified Smith as her abuser in response to the first question asked by the nurse and then to another asked by the doctor — “what happened?” The substance of M.D.’s statement was the very reason she was so upset — because she had been assaulted by her intimate partner, the father of her child. We have found the excited-utterance exception applies in similar circumstances. See State v. Richards, 809 N.W.2d 80, 95 (Iowa 2012) (holding domestic violence victim’s statement to her daughter that the defendant had put a cane to her neck was an admissible excited utterance because the victim had just come down the stairs, she “was upset and crying,” and her “neck was red”).
Accordingly, Í would affirm the district court’s admission of those statements as *200 excited utterances. I agree with the court of appeals that any error in allowing the police officer to testify about what M.D. told him was harmless error. For these reasons, I would affirm the judgment of the district court and decision of the court of appeals.
MANSFIELD and ZAGER, JJ., join this dissent.

. Smith was the father of M.D.’s daughter. M.D. and Smith also had a son together, but the son died.

. When an alternative ground supports a ruling admitting evidence, the proponent should brief and argue the alternative ground on appeal. Otherwise, our court may defer de *199 ciding the issue until a case in which we have the benefit of adversarial briefing,

. We have applied the excited-utterance exception after significantly longer time-lapses. See State v. Galvan, 297 N.W.2d 344, 347 (Iowa 1980) (holding the passage of two days "leaves [the evidence] close enough to the transaction so that the trial court could have believed any presumption of fabrication was excluded”); State v. Stafford, 237 Iowa 780, 785-87, 23 N.W.2d 832, 835-36 (1946) (holding statements made fourteen hours following the alleged crime satisfied "the test of spontaneity” and were "a natural expression of what had happened to [the victim]”). But see Tejeda, 617 N.W.2d at 754 (finding a thirty-minute time gap between the startling event and the statement "weigh[s] heavily against the [statement’s] admission”).