COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
| KARL QUINTON JOHNSON, | | No. 08-10-00094-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | Criminal district Court No. 2 |
| | § | |
| THE STATE OF TEXAS, | | of Tarrant County, Texas |
| | § | |
| Appellee. | | (TC # 1124720D) |
| | § | |

## O P I N I O N

Karl Quinton Johnson appeals his conviction of two counts of sexual assault of a child under seventeen years of age, enhanced by two prior felony convictions. After the jury found Appellant guilty, the trial court found the habitual offender enhancements true and assessed Appellant's punishment at imprisonment for fifty years on each count. We affirm.

### FACTUAL SUMMARY

At the time of the offense, Appellant was married to Phyllis Johnson. Phyllis's brother, Lorenzo Allen, Jr., is married to Eva Allen, the mother of the sixteen-year-old victim, Danika Allen. Danika had known both Appellant and Phyllis all of her life and she was close with her Aunt Phyllis, whom she considered to be a "second momma."

On the morning of August 13, 2008, one of Eva's friends from church took her to breakfast to provide encouragement because the Allens' thirteen-year-old son, Danny, had died two months earlier. The death had been difficult for all of the family but particularly so for Danika. Just before leaving the house, Eva briefly woke up both Danika and Lorenzo to tell them where she was going. Eva returned in about two hours and found her husband still asleep but Danika was not at home.

This was unusual because Danika always got permission before leaving the house. After a while, Eva and Lorenzo began looking for Danika but they could not find her anywhere. Eva called Phyllis but she had not seen Danika either. Finally, at about 6 p.m., Danika called and said that she was with Appellant. Danika's voice was shaky but Eva assumed that it was because Danika was afraid she would be in trouble for leaving the house without permission. Eva felt relieved because she had no reason to distrust Appellant. Immediately after this brief call, Eva spoke with Phyllis and told her that Danika was with Appellant. Phyllis replied that Danika could not be with Appellant because he was at work.[1] After hanging up, Phyllis drove by Appellant's workplace and did not see his car. Eva and Phyllis began waiting for Appellant to bring Danika home. While Eva was calm, Phyllis became hysterical and she urged Eva to call the police when Danika had not returned by midnight. Eva did not call the police at midnight since Appellant was a family member but she began to panic as more time passed and she finally made the call at around 2 or 3 in the morning. She gave the police the number Danika had called from the previous evening and she learned that it was from a pay phone. Danika walked in the house the following morning at 8 a.m. with her friend, Mariah. Appellant had dropped Danika off at Mariah's house because he did not want to take Danika to her house. Danika had walked the rest of the way home. Danika appeared depressed and withdrawn but she denied that anyone had touched her.

Later that day, Phyllis called and asked Eva to bring Danika to her house. Phyllis was furious and threatened to kill Appellant who had not yet returned home. During the drive, Eva saw Appellant in a vehicle and he attempted to flag her down but she refused to stop. Eva called Phyllis on her cell phone and told her that Appellant had tried to intercept them. Phyllis told her to not stop. Appellant followed them but he took off when he saw Phyllis come out of the house. Eva believed

---

[1] Appellant worked the second shift at Green Bay Packaging.

Phyllis had a gun. Eva attempted to calm Phyllis by reading scriptures and praying with her. Danika told Phyllis that nothing had happened. They visited with Phyllis for an hour or so before returning home. The following day, Phyllis called and told Eva to take Danika to her grandmother Margie's house. When they arrived, they found Appellant at the house. Danika went straight into a bedroom where she talked with Phyllis. Danika continued to deny that Appellant had engaged in any sexual activity with her. Later, Danika told Phyllis that Appellant and some other men had touched her. Phyllis became angry and hit Appellant. Phyllis made Danika tell the family what she had just told Phyllis. One of the family members called the police and Appellant was arrested.

Danika testified about what happened while she was with Appellant. Danika recalled answering the door that morning and finding Appellant, who she referred to as Uncle Karl, at the door. Danika was dressed in a tee-shirt, pajama bottoms, and slippers. Danika told Appellant that her mother had gone to breakfast and her father was still asleep. Appellant invited Danika to go with him to McDonald's and told her not to wake her father because they would be back in a few minutes. Danika agreed and she left the house in her pajamas. After stopping at McDonald's, Appellant drove to a "crack house." Appellant went inside while Danika waited in the car and ate. They left the crack house and went to Appellant's home for a short time but then returned to the crack house. Danika again waited in the car for about an hour before Appellant came out of the house and asked Danika to go inside with him. Appellant smoked crack while talking with a man he called "Old School." After a while, Appellant walked over to Danika and demanded that she stand up and remove her clothes. She noticed that Appellant's demeanor had changed and she had never seen him act that way. Danika complied because she was scared. Both Appellant and Old School sexually assaulted her for about an hour. During the assault, Danika thought how it would break her mother's heart to know she had been sexually assaulted and her mother had already been through so much

with Danny's death. Danika dressed after Appellant and Old School went into another room. After a while, Danika went into the other room and asked if she could go home. Appellant agreed and they got in the car but he took Danika to a motel where he rented a room. Appellant told Danika that she needed to clean up before he took her home so she got in the shower. Appellant got in the shower with her and touched her body and rubbed on her. After getting out of the shower, Danika asked Appellant for money to call her mother. Danika went to a payphone and called her mother. Danika told her she was with Appellant but she did not tell her mother where she was at or what Appellant had done to her. When Danika returned to the motel room, two women came into the room and began using drugs and engaging in sex with Appellant. After one of the women made a phone call, another man arrived and sexually assaulted Danika. After these people left, Danika fell asleep. During the night, Appellant engaged in anal and vaginal intercourse with Danika. Danika recalled that it hurt badly when Appellant placed his penis in her anus. The following morning, Appellant drove Danika to her friend Mariah's house and he told her to tell everyone she had been with her boyfriend, Trey. Danika agreed because she thought if she just told Appellant what he wanted to hear he would "let [her] out safe and sound." Danika did not tell Mariah that Appellant had sexually assaulted her. Mariah gave her clothes to wear so she did not have to go home in her pajamas which were dirty. Danika was afraid to go home because she did not want to tell her mother what had happened. Consequently, Danika initially told her mother and Phyllis that nothing had happened. She did tell them Appellant had taken her to a crack house and motel but she denied any sexual abuse. At some point after returning home, Danika spoke with Trey and told him everything that had happened to her. Trey encouraged her to tell her family about the assault. After speaking with Trey by telephone, Danika told Phyllis that Appellant had assaulted her.

That same day, Danika underwent a sexual assault examination. The sexual assault nurse

examiner found a large one-half to one centimeter tear in the anus. The tear was red, indicating it was fresh, and it was consistent with anal penetration. The nurse also collected forensic evidence during the exam and the evidence was later submitted for analysis. Sperm was found on the perianal, vaginal, and vulvar swabs. DNA analysis revealed that Appellant could not be excluded as the DNA contributor of the sperm fraction on the vaginal and anal swabs whereas 99.998 percent of the Caucasian, African-American, and Southwestern Hispanic populations could be excluded as possible contributors to the DNA mixture.

Detective Brent Ezelle conducted a recorded interview of Appellant on the day of his arrest. Appellant admitted that he picked up Danika at her house and took her to a crack house. Appellant initially denied having sex with Danika but when Detective Ezelle asked him whether he put his penis in her vagina, Appellant replied, "I hit it a little bit, man." He added that he did not ejaculate.

The jury found Appellant guilty of Counts 1 and 2 of the indictment which alleged that he sexually assaulted Danika by contacting her sexual organ and anus with his sexual organ. The jury acquitted Appellant of Count 3 which alleged that Appellant's mouth contacted the victim's sexual organ, of Count 4 which alleged that Appellant inserted his finger in the victim's female sexual organ, and of Count 5 which alleged that Appellant contacted the victim's breast with the intent to arouse or gratify his sexual desire. The trial court found the habitual offender allegations true and assessed Appellant's punishment at imprisonment for fifty years on each count.

### VICTIM'S STATEMENTS TO NURSE

In Issues One and Two, Appellant challenges the trial court's decision to admit the testimony of the sexual assault nurse examiner regarding hearsay statements made by the victim. Appellant argues that the State failed to establish the predicate for admission of these statements under TEX.R.EVID. 803(4) because the nurse took the history from the victim in order to assist her in

collecting forensic evidence rather than for medical treatment or diagnosis.

Carolyn Walsh, the sexual assault nurse examiner, took a history from Danika by asking her to explain in her own words what happened to her. Walsh testified that a history is taken from the patient for the purpose of medical treatment and to give the examiner direction when collecting evidence. Walsh testified over Appellant's hearsay objection that Danika told her that:

> Basically she stated that he, being her uncle, told her they were going somewhere and didn't take her there. That he had lied to her. They ended up at a crack house where he then proceeded to bring another gentlemen in. And himself -- and he masturbated in front of her, put his fingers in her genitalia, and then was sucking on her breast. Then they left. She kept wanting to go home. He would not take her. They left there and went to a motel where then prostitutes were brought in and another gentlemen. And she was then assaulted again by her uncle both vaginally and in the anus. And also by another gentleman that was there.

### Standard of Review

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex.Crim.App. 2006); *McDonald v. State*, 179 S.W.3d 571, 576 (Tex.Crim.App. 2005). The trial court abuses its discretion only when the decision lies "outside the zone of reasonable disagreement." *Walters v. State*, 247 S.W.3d 204, 217 (Tex.Crim.App. 2007).

### Rule 803(4)

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted. TEX.R.EVID. 801(d). Hearsay is generally inadmissible except as provided by statute or rule. TEX.R.EVID. 802. Once the opponent of hearsay evidence makes the proper objection, it becomes the burden of the proponent of the evidence to establish that an exception applies. *Taylor v. State*, 268 S.W.3d 571, 578-79 (Tex.Crim.App. 2008). Rule 803(4) provides an exception for "[s]tatements made for purposes of

medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." TEX.R.EVID. 803(4). Rule 803(4) is based on the declarant's strong motive to tell the truth in order to receive proper medical diagnosis and treatment. *Taylor*, 268 S.W.3d at 580; *see Beheler v. State*, 3 S.W.3d 182, 188 (Tex.App.--Fort Worth 1999, pet. ref'd)(noting that the exception is based on the assumption that the patient understands the importance of being truthful with the medical personnel to receive an accurate diagnosis and treatment). For evidence to be admissible under this exception, the proponent must show that: (1) the declarant was aware that the statements were made for the purpose of medical diagnosis or treatment and that proper diagnosis or treatment depends upon the veracity of such statements; and (2) the particular statement proffered is pertinent to treatment or diagnosis. *Taylor*, 268 S.W.3d at 589-91.

Appellant complains that Danika did not understand the purpose of the exam, and therefore, she could not have been aware of the necessity to be truthful when relating her medical history. The prosecutor had the following exchange with Danika about the sexual assault examination:

[The prosecutor]: Okay. And did you go to the doctor?

[Danika]: Yes.

[The prosecutor]: Did you tell the doctor what happened or the nurse?

[Danika]: I don't remember telling the story again.

[The prosecutor]: Okay. Did they ask you why you were there at the hospital, do you remember?

[Danika]: No, I don't remember.

[The prosecutor]: Okay. Did they do a physical exam of you?

[Danika]: Yes.

[The prosecutor]: Had you ever had one of those before?

[Danika] No.

[The prosecutor]: Was it a good experience or a bad experience or can you say?

[Danika]: I was just looking like why you got me on a bed like this, you know. And then I was kind of shaking because I didn't want -- I was already exposed to people and then I didn't want to be exposed to nobody else. So it was kind of hard for her to examine what was going on with me because I was shaking.

In making his argument that Danika did not understand the purpose of the exam, Appellant points exclusively to Danika's statement "why you got me on a bed like this, you know." When taken at face value and out of context, the statement could indicate Danika did not understand the purpose of the exam, but the statement was made in response to being asked whether it was a good or bad experience. Danika had never before undergone a gynecological examination so she had never been on a examination table designed for that purpose and she was obviously nervous and upset. When considered in context, her statement "why you got me on a bed like this" is better understood as an expression of her emotional discomfort during the examination.

The Court of Criminal Appeals recognized in *Taylor* that the declarant's awareness under the first part of the test can be inferred from the circumstances where the declarant is being seen for an injury or illness in certain healthcare settings such as an emergency room or physician's office because an adult or child of sufficient age or maturity will have an implicit awareness that the doctor's questions are designed to elicit accurate information and that veracity will serve his best interest. *Taylor*, 268 S.W.3d at 589. In this case, the sixteen-year-old victim was seen by the sexual assault nurse examiner in an emergency room setting less than forty-eight hours after the assaultive

conduct ended.[2]  Although the State did not ask Danika or Walsh questions to establish whether Danika had understood the need to be truthful during the medical history portion of the exam, there is nothing in the record to negate that she possessed the necessary awareness.  *See Taylor*, 268 S.W.3d at 589.  The trial court could have reasonably inferred from the circumstances that the victim had the necessary awareness.  *Beheler*, 3 S.W.3d 188-89.

Turning to the second part of the test, the proponent of the evidence must also show that the particular statement is pertinent to treatment or diagnosis.  The object of a sexual assault examination is to ascertain whether the victim has been sexually abused and to determine whether further medical attention is needed.  *Beheler*, 3 S.W.3d at 189.  Consequently, the victim's description of the particular acts of sexual abuse are pertinent to the medical diagnosis and treatment.  *Id.*  Walsh specifically testified that obtaining the history from the victim was necessary for medical treatment. She elicited from Danika that she had been sexually abused over an extended period of time by more than one assailant and the abuse included penetration of the female sexual organ and anus.  Based on this information, Walsh examined these areas of the victim's body for injury and found a large tear in the anus.  The trial court did not abuse its discretion by impliedly finding that Danika's description of the acts of abuse was pertinent to treatment or diagnosis.

Appellant asserts that the following statements are not pertinent to diagnosis or treatment: (1) Appellant lied to Danika; (2) Appellant took Danika to a crack house; (3) Appellant masturbated in front of her; (4) Danika wanted to go home but Appellant would not take her; (5) Appellant took her to a motel where prostitutes and another man were brought into the room; and (6) Danika identified Appellant as the perpetrator.  The State responds that identifying both the environment

---

[2]  Danika testified that Appellant sexually assaulted her during the night of August 13, 2008 and the early morning of August 14, 2008.  Danika returned home at 8 a.m. on August 14, 2008.  She told her family about the assault the following morning at around 11 a.m. and the sexual assault exam was performed that same day.

where the assaults occurred and the other assailants is necessary for the medical personnel to conduct a thorough examination and anticipate any consequences that the victim might have suffered as a result of the assault. Walsh did not expressly testify that obtaining this information was necessary for medical diagnosis and treatment but it is reasonable for a healthcare provider to ascertain whether the child victim had been sexually assaulted by more than one assailant, and whether she had been exposed to drugs or sexually transmitted diseases. The second and fifth statements are pertinent to these determinations.

Appellant takes particular issue with Walsh relating that Danika had identified her uncle as the perpetrator. He argues that the statement is not pertinent to diagnosis or treatment. When the perpetrator of a sexual assault is a family member, a child victim's statement identifying her assailant is reasonably pertinent to diagnosis and treatment because the treatment of child abuse includes removing the child from an abusive setting. *Bargas v. State*, 252 S.W.3d 876, 896 (Tex.App.--Houston [14th Dist.] 2008, no pet.); *Fleming v. State*, 819 S.W.2d 237, 247 (Tex.App.--Austin 1991, pet. ref'd); *see United States v. Renville*, 779 F.2d 430, 437-38 (8th Cir. 1985)(child victim's statement identifying her assailant admissible under FRE 803(4) because the statement is reasonably pertinent to treatment of psychological and emotional injury resulting from child abuse and the exact nature and extent of the psychological problems often depends on the identity of the abuser).

Finally, the State does not offer any theory how the first, third, and fourth statements are pertinent to medical diagnosis or treatment. Nevertheless, the trial court could have reasonably found that the statements regarding Appellant's conduct are relevant to the existence and degree of psychological and emotional injury. *See Renville*, 779 F.2d at 437. We conclude that the trial court did not abuse its discretion by determining that the hearsay statements were admissible under Rule 803(4).

Even if the victim's statements to Walsh are inadmissible under this exception, the error is harmless. We will not reverse a trial court's judgment based on the erroneous admission of evidence unless the error affects a substantial right. TEX.R.APP.P. 44.2(b); *Taylor*, 268 S.W.3d at 592; *Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App. 1998). Substantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex.Crim.App. 2002); *Stevens v. State*, 234 S.W.3d 748, 784 (Tex.App.--Fort Worth 2007, no pet.). The error in admission of evidence is harmless when substantially similar evidence is introduced at trial. *Bourque v. State*, 156 S.W.3d 675, 677 (Tex.App.--Dallas 2005, pet. ref'd).

Appellant argues that the admission of this evidence is not harmless because it corroborated Danika's testimony. In asserting that Danika's testimony had serious credibility problems, Appellant points to her failure to seek help when she left the motel room to call her mother, her repeated denial that any abuse had occurred, and the discrepancies between her testimony and what she told the detective who investigated the case.[3]

Walsh's testimony was presented after Danika testified in detail about the offense. Walsh's testimony certainly showed that Danika had previously given a statement consistent on certain points with her trial testimony, but the hearsay statements do not pertain to the particular points relied on by Appellant to challenge Danika's credibility. The hearsay testimony does not explain why Danika failed to seek help or why she initially denied that any abuse had occurred. Further, admission of

---

[3] Appellant identifies the following discrepancies: (1) Danika testified she was not wearing a bra when she left the house but she told Detective Ezelle that she had worn a bra; (2) Danika testified that Appellant got in the shower with her at the motel but she told Ezelle that Appellant left the motel room while she was in the shower; and (3) Danika testified that Appellant told her to tell everyone she had been with Trey and Danika agreed, but she told Ezelle that she told Appellant she was going to tell her mother what Appellant had done and she would hurt him.

the hearsay did not diminish Appellant's ability to utilize the alleged discrepancies in Danika's testimony to challenge her credibility. Regarding Appellant's assertion that he was harmed by the hearsay statement identifying him as the perpetrator, the record contains other evidence which supports an inference that Danika was with Appellant while she was missing. Eva testified that Danika told her when she called that she was with Appellant and Phyllis confirmed that Appellant was absent from work. Further, the DNA evidence corroborated Danika's identification of Appellant as the perpetrator of the sexual assault. The record also includes evidence demonstrating Appellant had a consciousness of guilt because he tried to intercept Eva and Danika as they were on their way to talk with Phyllis. Finally, Appellant admitted during his interview that he "hit it a little bit" when asked by the detective whether he had put his penis in the victim's female sexual organ. After examining the entire record, we conclude that any error in admitting the hearsay did not influence the jury, or had but a slight effect. Issues One and Two are overruled.

## CHARACTER EVIDENCE

In Issue Three, Appellant argues that the trial court abused its discretion by permitting the State to ask Phyllis Johnson "did you know" questions when Appellant had not first introduced character evidence. Appellant contends that the line of questioning was impermissible under TEX.R.EVID. 608 and it was harmful because it had the effect of trivializing Phyllis' testimony and humiliating her before the jury. The State responds that the line of questioning was a proper method of rebutting a defensive theory.

It is undisputed that Appellant's defense included an attack on the credibility of the complainant. The defensive theory was that Danika had consensual sex with her boyfriend, Trey, while she was with Appellant, and she falsely accused Appellant to hide her indiscretion from her family. In support of this theory, Phyllis testified that Danika had repeatedly denied any abuse and

she made the accusation against Appellant only after talking with the boyfriend and while he remained on the open telephone line. During cross-examination, Phyllis stated that she initially believed Danika's accusation against Appellant but she later changed her mind after catching Danika in several lies. At this point in the testimony, the State attempted to ask Phyllis whether she knew Appellant had made certain admissions during interrogation. Appellant raised a number of objections which did not relate to Rule 608.[4] The prosecutor then argued that because the witness had expressed a negative opinion about the victim's credibility, he was entitled to explore whether her opinion would change if she knew certain facts already admitted into evidence. Appellant responded with the following objection:

> Your Honor, the only person that asked her about anything that would suggest her opinion of the credibility of the witness was the prosecution. So now they're boot-strapping. They -- they've have [sic] gone down this road and they perhaps don't like the responses, so now they're looking to -- throw these outside statements in and the form of the question is improper.

The trial court overruled the objection and gave Appellant a running objection to the line of questioning. The prosecutor then asked Phyllis a number of "did you know" questions based on Appellant's admissions made during his recorded statement and the DNA evidence all of which had already been introduced into evidence.[5]

Appellant contends that the State is not permitted to rehabilitate its witness and at the same time attack the defense witness by "showing specific instances of truthfulness." Rule 608 addresses

---

[4] Appellant initially raised the following objections: (1) "Object to the form of the question and the relevance of whether any witness is surprised;" (2) "I object to the form of the question whether the witness is surprised and it's a comparing testimony. It's argumentative and it's -- not really this witness's personal knowledge of anything;" (3) "Your Honor, I'm going to continue to object to the form of this -- this questioning, asking her about evidence that she has not heard, that the district attorney knows she has not heard."

[5] For example, the prosecutor asked Phyllis whether she knew Appellant admitted during the interview that he was naked in front of Danika, he had oral sex with prostitutes, he got in the motel bed with Danika, and he told the detective that he "hit it a little" but did not ejaculate.

evidence of character and conduct of a witness. TEX.R.EVID. 608. It provides that the credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but the evidence may refer only to character for truthfulness or untruthfulness, and evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise. TEX.R.EVID. 608(a). Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, other than conviction of crime as provided in Rule 609, may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence. TEX.R.EVID. 608(b). Appellant does not cite any cases holding that Rule 608 prohibits a party from asking a witness questions about evidence already admitted which conflicts with the witness's testimony. Indeed, illuminating such weaknesses in the witness's testimony is a primary function of cross-examination. Issue Three is overruled.

## ADMISSION OF APPELLANT'S STATEMENT TO POLICE

In his final issue, Appellant contends that the trial court erred by determining that his oral statements were admissible because he did not knowingly, intelligently, and voluntarily waive his rights under Article 38.22 of the Code of Criminal Procedure. Article 38.22 of the Code of Criminal Procedure establishes procedural safeguards for securing the privilege against self-incrimination. TEX.CODE CRIM.PROC.ANN. art. 38.22 (West 2005); *Joseph v. State*, 309 S.W.3d 20, 23 (Tex.Crim.App. 2010). No oral statement of an accused made as a result of custodial interrogation is admissible against the accused in a criminal proceeding unless (1) the statement was recorded and (2) prior to the statement but during the recording, the accused was warned of his rights and knowingly, intelligently, and voluntarily waived those rights. TEX.CODE CRIM.PROC.ANN. art. 38.22, § 3. Subsection 2 requires that the defendant be informed of the following rights:

(1) he has the right to remain silent and not make any statement at all and that any

statement he makes may be used against him at his trial;

(2) any statement he makes may be used as evidence against him in court;

(3) he has the right to have a lawyer present to advise him prior to and during any questioning;

(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he has the right to terminate the interview at any time.

TEX.CODE CRIM.PROC.ANN. art. 38.22, § 2(a). For the statement to be admissible, the defendant must knowingly, intelligently, and voluntarily waive the foregoing rights. TEX.CODE CRIM.PROC.ANN. art. 38.22, § 2(b); *Joseph*, 309 S.W.3d at 24. The burden is on the State to prove by a preponderance of the evidence that a defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. *Joseph*, 309 S.W.3d at 24.

Appellant admits that the required warnings were given and he told the detective that he understood his rights, but he maintains that he never explicitly waived his rights. This is the same argument made by the defendant in *Joseph*. The Court of Criminal Appeals stated that such an argument runs contrary to the general rule that neither a written nor an oral express waiver is required. *Joseph*, 309 S.W.3d at 24. While a valid waiver of rights will not be presumed from the silence of the accused after warnings are given, a waiver need not assume a particular form and, in some cases, a "waiver can be clearly inferred from the actions and words of the person interrogated." *Id.*, *quoting North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). The question is not whether the defendant "explicitly" waived his *Miranda* rights, but whether he did so knowingly, intelligently, and voluntarily under the standard outlined in *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). *Joseph*, 309 S.W.3d at 25. Under this standard, the relinquishment must have been voluntary in the sense that it was the product of a free and

deliberate choice rather than intimidation, coercion, or deception. *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141. Further, the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id.* Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Id.* The totality-of-the-circumstances approach requires consideration of all the circumstances surrounding the interrogation, including the defendant's experience, background, and conduct. *Joseph*, 309 S.W.3d at 25, *citing Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

The record supports a conclusion that Appellant's waiver resulted from a free and deliberate choice without intimidation, coercion, or deception. We have reviewed the testimony from the suppression hearing and the audio recording of the interview. After receiving the warnings and indicating that he understood them, Appellant participated in an interview which lasted approximately forty-two minutes and he did not ask for an attorney or terminate the interview. Ezelle testified and the recording reflects that the detectives did not threaten Appellant or use physical or psychological coercion and they did not make him any promises in order to obtain the statement. The totality of the circumstances surrounding the interrogation shows Appellant's waiver was voluntary.

We now examine whether Appellant's waiver was made with full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. After bringing Appellant into the interview room, Ezelle immediately turned on the recording device and read Appellant the *Miranda* warnings found on State's Exhibit 1. Ezelle then asked Appellant to read the warnings himself and to place his initials next to each of the five warnings as he read them.

After Appellant finished reading the warnings and initialing them, Ezelle asked Appellant whether he had any questions and Appellant stated he did not. Appellant indicated he understood his rights and signed the warnings form. Ezelle then asked Appellant whether he knew why he was there and proceeded with the interview. The warnings made Appellant aware of the rights set forth in Article 38.22, as well as the consequences of abandoning those rights. *Joseph*, 309 S.W.3d at 27.

By indicating that he understood his rights and then freely answering the detectives' questions without invoking those rights, Appellant demonstrated by his conduct that he waived those rights. *See Wells v. State*, No. 08-09-00110-CR, 2010 WL 3009306 at *6 (Tex.App.--El Paso July 30, 2010, pet. ref'd)(finding that waiver could be inferred from the defendant's participation in interview immediately after being warned where defendant did not request counsel or ask to terminate the interview); *Gately v. State*, 321 s.W.3d 72, 78 (Tex.App.--Eastland 2010, no pet. h.)(finding that waiver could be inferred from the defendant's words and conduct, including his willing participation in the interview). The totality of the circumstances shows that Appellant knowingly, intelligently, and voluntarily waived his rights under Article 38.22. We overrule Issue Four and affirm the judgment of the trial court.


August 31, 2011

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)