# IN THE COURT OF APPEALS OF IOWA

No. 17-0744
Filed August 1, 2018

**STATE OF IOWA,**
　　　　Plaintiff-Appellee,

**vs.**

**DARRELL LEE McBRIDE,**
　　　　Defendant-Appellant.

_____

Appeal from the Iowa District Court for Scott County, Henry W. Latham II, Judge.

The defendant appeals from his convictions for sexual abuse in the third degree. **AFFIRMED.**

Nathan Legue of Legue Law, P.C., Davenport, for appellant.

Thomas J. Miller, Attorney General, and Kyle P. Hanson, Assistant Attorney General, for appellee.

Considered by Potterfield, P.J., Bower, J., and Mahan, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2018).

**POTTERFIELD, Presiding Judge.**

Darrell McBride appeals from his convictions for two counts of sexual abuse in the third degree, in violation of Iowa Code section 709.4(1)(b)(2) (2016)[1]. McBride maintains there is insufficient evidence to support either conviction. He also challenges two of the district court's evidentiary rulings and maintains he should have been granted a new trial due to juror bias.

**I. Background Facts and Proceedings.**

In November 2016, McBride was charged by trial information with two counts of sexual abuse in the third degree. In count I, it was alleged that on or about September 5, 2016, McBride performed a sex act on J.W., who was then thirteen years old. In count II, it was alleged that on or about June 1, 2015, McBride performed a sex act on J.W., who was then twelve years old. McBride shared a residence with J.W., her mother, and several of J.W.'s siblings.

The matter proceeded to a trial by jury in January 2017.

At trial, J.W.'s godmother testified she was at the home of J.W. and McBride on September 5, 2016 for a Labor Day celebration. J.W. appeared to be really sad and bothered; at some point, J.W. stated she wanted to kill herself. When the godmother attempted to speak to her about what was wrong, J.W. expressed that her mother picks McBride over her children. Later, J.W. informed her godmother that McBride had been having sex with her. J.W.'s godmother then took J.W. to her home and called the local police. J.W. seemed reluctant to speak to officers

---

[1] The trial information alleges that count I occurred in 2016 while count II occurred in 2015. As no changes to the relevant statute were made between the two instances, we refer to the 2016 code throughout.

and indicated she was afraid she would be taken away from her family. However, J.W. made the same allegation to an officer over the phone and reported that McBride had "touched her" within the previous twenty-four hours. The officer then directed the godmother to take J.W. to a local hospital for a sexual-assault examination.

J.W., who turned fourteen shortly before the trial began in 2017, testified she had last lived in the same home as her family on Labor Day 2016 and had since been staying with her godmother. She initially testified McBride had "hurt" her, with the most recent occurrence happening in McBride's bedroom on Labor Day. She testified he hurt her the same way every time and that it happened more than two times. J.W. later specified that McBride used his "private part" to touch "on the inside" of her "private part." She agreed that was what she meant when she testified as to him hurting her. Additionally, J.W. testified about a second specific incident in which McBride had sexual intercourse with her. She testified that while they lived in the same residence, McBride "hurt" her on the living room floor while they were under a blanket. She described her mother walking into the room and pulling the blanket off of them and then "cussing and yelling." J.W. testified she got up and ran into the bathroom crying when her mother arrived. She stated she was wearing shorts at the time her mother removed the blanket while McBride was wearing boxers and shorts. J.W. testified this incident occurred "[a] short time before" the Labor Day incident. When asked, J.W. testified she had never engaged in sexual intercourse with a boyfriend.

Next, the nurse who conducted the sexual assault exam testified. She testified that she asks the patient if they know the person who assaulted them

"[p]rimarily for the safety of the patient. Once they are discharged, we want to make sure that they are not going to be in harm's way once they leave. And that is basically the primary reason[]. Especially with a 13 year old." Over McBride's objection, the nurse was allowed to testify that during the exam on September 5, J.W. "stated to me that her, quote, unquote, dad, who she later on explained to be Darrell McBride that has acted as her father since she was an infant, had been raping her for months." The nurse testified that during the exam, a hospital aide entered the room and indicated to J.W. that her father was on the telephone and would like to speak to her; J.W. became visibly upset at the news. Additionally, during the exam, the nurse noted a substance that resembled seminal fluid coming out of J.W.'s cervical os and testified she could see that part of J.W.'s cervix was inflamed with small bumps—representing some sort of trauma to the cervix. When asked, J.W. told the nurse she was a virgin prior to any contact with McBride and that she never been sexually active with anyone else.

J.W.'s older sister, I.W., testified for the State at trial. During I.W.'s testimony, the State admitted into evidence a letter McBride had sent to I.W., stating in part, "Hey, baby girl, how are you? Baby, I need you again, so listen closely, okay? If and when I have to call you to the stand at court, I need you to say you saw [J.W.] that night doing something to me while I was asleep." I.W. confirmed she had not witnessed what McBride asked her to say she saw. The State also played for the jury a phone call McBride had made from jail to I.W. while he was incarcerated pending trial. During the call, McBride asks I.W. to get some of J.W.'s friends to tell a teacher that J.W. told them that if they were having trouble with their parents not letting them go to parties, they should "do [their] thing" on

their father when he was drunk or passed out because she did that and now her father was in jail and she could do whatever she wanted. During the call, McBride tells I.W. to offer the friends $100 each if they agree to say it, says he needs two to three friends to do it, and tells I.W. he is "setting [him]self up for trial."

J.W.'s mother testified about the time when she found McBride and J.W. under a blanket in the living room. According to the mother's testimony, McBride and J.W. were on the floor with McBride lying next to J.W. when the mother removed the blanket. She then saw J.W. was naked as J.W. got up and ran to the bathroom crying. The mother testified the incident occurred "actually a week" before the Labor Day incident and that the family had not moved into the residence until July 3, 2016.

The criminalist in charge of conducting the DNA testing on the evidence submitted for the case testified as well. She testified she located two spots of seminal fluid on the interior lining of the underwear J.W. indicated she had been wearing on Labor Day. The first spot had the DNA of both J.W. and a second contributor. The DNA of the second contributor was "consistent with" the DNA of McBride, with fourteen out of fifteen loci matching. She testified that "[t]he probability of finding th[at] profile in a population of unrelated individuals chosen at random would be less than 1 out of 100 billion." The second spot also had both the DNA of J.W. and a second contributor. With the second spot, she was able to say the second contributor's DNA matched McBride's DNA as all fifteen out of fifteen of the loci matched. The State noted earlier testimony that J.W.'s underwear that had been tested had been retrieved from a laundry pile by an officer on the night of September 5 in order to be taken as evidence; the criminalist was

asked whether it was possible the DNA found on J.W.'s underwear that was not hers could have transferred from other clothing in the pile. She testified it was "possible" though "not very likely." When asked why, she elaborated:

> It would be more—because of the profiles I developed, they are pretty strong in nature, the ones that I have reported on. It would have taken either a wet stain—two wet stains to touch, because both DNA came out of the cutting stain. Or it could probably have taken some friction, so rubbing together or that nature, to get transfer to [a] dry a DNA profile. So just having a pair of boxers touch a pair of underwear may not necessarily have any transfer happen.

The State then clarified that the criminalist would not expect "two items of clothing in a pile of laundry together . . . to have a very strong chance of transfer of DNA profiles," to which the criminalist responded, "That's correct. It wouldn't be likely that I would expect a large amount of DNA to transfer." Another piece of evidence came from a test for DNA on the swab that was taken of J.W.'s cervix where the criminalist found a second contributor's DNA, with indications the second individual was male. She could not identify the second contributor.

Additionally, the criminalist tested for DNA a swab that had been taken of McBride's penis on Labor Day after J.W. spoke to the police; the penile swab contained both the DNA of McBride and DNA consistent with that of J.W.—with ten of fifteen loci matching and a probability of finding that profile in a population of unrelated individuals chosen at random of less than one out of eighty-nine billion. When asked, the criminalist testified that she could not conclusively eliminate J.W.'s mother as the second contributor of the DNA found on the penile swab of McBride, stating, "I can't eliminate the mother's DNA without seeing her profile, but that would be uncommon to have a mother share the exact DNA at all the different locations."

Before resting, the defense called a social worker with the Iowa Department of Human Services to testify; she indicated that the family did not move into the residence in question until August 2015.

The jury convicted McBride as charged. He later filed a motion for new trial, which the district court denied. The court sentenced McBride to two consecutive fifteen-year terms of incarceration.

McBride appeals.

## II. Discussion.

### A. Sufficiency of the Evidence

McBride claims the State presented insufficient evidence to support either of his convictions for sexual abuse in the third degree. We review sufficiency-of-the-evidence claims for correction of errors at law. *State v. Romer*, 832 N.W.2d 169, 174 (Iowa 2013). "In reviewing challenges to the sufficiency of the evidence supporting a guilty verdict, courts consider all of the record evidence viewing the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *Id.* (citation omitted).

### 1. September 2016 Charge.

McBride maintains there is insufficient evidence to support the jury's determination he committed a sex act upon J.W. in September 2016. McBride attacks the "reliability" of J.W.'s testimony and the scientific evidence.

First, we note that a sufficiency-of-the-evidence claim is not the proper vehicle to challenge witness credibility. *Cf. State v. Reeves*, 670 N.W.2d 199, 202 (Iowa 2003) (noting "the power of the court is much broader" when reviewing a challenge to the weight of the evidence because "[i]t may weigh the evidence and

consider the credibility of witnesses."). Moreover, we believe the "inconsistencies" that McBride relies upon to attack J.W.'s credibility can be reconciled. *See* Iowa Uniform Jury Instruction 100.7 (charging the jury to "[d]ecide the facts from the evidence" and "[t]ry to reconcile any conflicts in the evidence").

McBride claims I.W.'s testimony regarding the early morning hours of Labor Day conflicts with that of J.W. But I.W. testified she had a friend stay over that night and they stayed up watching movies until "like 3:00 [a.m.] maybe." At the time she went to sleep, I.W. believed J.W. was in her room, which was downstairs. J.W. testified she was asleep in her room when McBride woke her up and that is how she "ended up" in McBride's room. The nurse who conducted the sexual-assault exam testified that based upon her conversation with J.W. about the events, they "kind of narrowed it down to approximately 4:00 . . . in the morning on the 5th" that the assault occurred. Additionally, McBride claims J.W.'s testimony is unreliable because I.W. testified that when she fell asleep, the doors of the two rooms were open with her younger siblings sleeping in McBride's room with him. But there was no testimony regarding the location of the younger children or the status of the door at approximately 4:00 a.m.—after I.W. was asleep.

Next, McBride claims the DNA evidence was not strong enough to convict him, as it is possible that the DNA found inside J.W.'s underwear transferred there from other clothes in the dirty laundry pile. Also, he maintains that the DNA consistent with J.W.'s that was found on his penis could have either come from his hand or could have been J.W.'s mother's DNA, as the criminalist could not rule out the mother. We deal with the second argument first. While the criminalist testified she could not eliminate the mother as a possibility since she had not been given

the mother's DNA to test, she also testified it "would be uncommon to have a mother share the exact DNA at all the different locations." Additionally, there was testimony the mother and McBride had been fighting and, as a result, the mother had been staying elsewhere for at least one night. As for McBride's first argument, the criminal testified that it was "not very likely" that the DNA found inside of J.W.'s underwear came from other laundry due to the strength of the specimen and its mix with J.W.'s own DNA. Plus, J.W. testified she had not been sexually active with anyone else, and the nurse noted seminal fluid in and trauma to her cervix.

While the physical evidence in this case supports J.W.'s testimony, J.W.'s testimony alone is sufficient to support a conviction. *See State v. Knox*, 536 N.W.2d 735, 742 (Iowa 1995) ("The only direct evidence is the complainant's testimony. But under today's law that is sufficient to convict. The law has abandoned any notion that a rape victim's accusation must be corroborated."). Moreover, insofar as J.W.'s and I.W.s testimony was contradictory, the question of credibility was for the jury to decide. *See State v. Laffey*, 600 N.W.2d 57, 60 (Iowa 1999) (citing *State v. Romeo*, 542 N.W.2d 543, 549–50 (Iowa 1996) (rejecting insufficiency-of-the-evidence-claim despite inconsistencies in the testimony of the two primary witnesses against the defendant, holding it was for the jury to decide if the witnesses were credible)).

There is overwhelming evidence to support this conviction, and the district court did not err in denying McBride's motion to acquit him of this charge.

### 2. June 2015 Charge.

McBride challenges the sufficiency of the evidence to support the conviction for the second charge of sexual abuse in the third degree, charged as having been

committed June 2015. He challenges the State's evidence of the date the incident was alleged to have occurred, claiming that the testimony established that the incident with the blanket could not have occurred in the residence in question in June 2015, as the family did not reside in the home at that time.

McBride is correct that the testimony and evidence elicited at trial do not establish that the sex act occurred in June 2015. The mother—who was criticized for not doing more to protect J.W.—testified the blanket incident occurred only about one week before J.W. reported the abuse on Labor Day 2016. The social worker testified the family did not move into the home until August 2015. And the lead detective admitted he did not have an exact date for the incident and picked "on or about June 1, 2015" because the mother reported that she remembered it was warm out when it occurred and that school had ended for the year.

However, the confusion and contradictory testimony about when the sex act occurred have no effect on the sufficiency of the evidence to establish whether it occurred. It is undisputed the incident occurred prior to Labor Day 2016, so J.W. could not have been more than thirteen years old at the time, as she did not turn fourteen until 2017. *Compare* Iowa Code § 709.4 (1)(b)(2) (defining sex abuse in the third degree as a sex act perpetrated against a person who is twelve or thirteen years of age). Like in *Laffey*, while there was contradictory testimony about when the blanket incident occurred, no witness disputed whether it occurred. 600 N.W.2d at 60 ("We also reject the defendant's argument that the confusion among the witnesses as to when this incident occurred fatally undermines the jury's finding of guilt. Although the witnesses disagreed as to the date that the children stayed at the Laffey home, no one disputed that the girls had on one occasion spent the

night there.  Under these circumstances, any uncertainty as to the precise date is immaterial.").

This is not a case where the incorrect date of the allegation deprived McBride of notice for what act or incident he was being charged.  *See State v. Grice*, 515 N.W.2d 20, 22 (Iowa 1994) ("The purpose of an indictment or information is to apprise the defendant of the crime charged so that the defendant may have the opportunity to prepare a defense.").  The trial information and the attached minutes of evidence reference that the mother is expected to testify about when she saw McBride with J.W. naked under a blanket, and the incorrect date did not keep McBride from understanding what event was being described.  In a phone call to J.W.'s mother that McBride made from jail, he offers an explanation why she found him on the floor with J.W. that day and tells her she was wrong about the date she told the police because it occurred in July rather than June. Additionally, in a phone call to his mother from jail, McBride expresses that he is "not even worried" because "one of those charges that they got on me, that ain't even the month or the date—the month or nothing that none of that was supposed to happen.  That was three months after the date that they got."  Because the charged date of the incident did not mislead McBride and is not a material fact to be proved by the State[2] and sufficient evidence establishes the necessary elements, the district court did not err in denying McBride's motion to acquit him of this charge.

---

[2] While we recognize that our current case law does not require it, we believe best practice would be for the State to move to amend the trial information once it becomes clear—as it did here—that the date used is not and could not be the date of the charged offense.

**B. Evidentiary Challenges.**

McBride challenges two of the district court's rulings to his evidentiary objections. He maintains the district court erred when it overruled his hearsay objection to the nurse's testimony that J.W. identified McBride as the perpetrator to her during the sexual-assault exam.[3] He also claims the court should have sustained his objection to the prosecutor's leading question while examining J.W.

***1. Hearsay Objection.***

We review hearsay claims for correction of errors at law. *State v. Pardee*, 775 N.W.2d 554, 560 (Iowa 2009). "This standard of review extends to determining whether statements come within an exception to the general prohibition on hearsay evidence." *Id.*

Iowa Rule of Evidence 5.803(4) allows a witness to testify regarding a statement that would otherwise be inadmissible as hearsay if the statement "is made for—and is reasonably pertinent to—medical diagnosis or treatment" and "[d]escribes medical history, past or present symptoms or sensations, or the inception of general cause of symptoms or sensations." McBride maintains J.W.'s statement to the nurse identifying him as the perpetrator does not fall within this exception. We disagree.

Generally, "[t]he identity of the perpetrator of physical injuries is not understood to be necessary information for effective medical treatment," *State v. Smith*, 876 N.W.2d 180, 186 (Iowa 2016) (citing *United State v. Joe*, 8 F.3d 1488,

---

[3] McBride's trial counsel did not explicitly state that she was making a hearsay objection, but we understand her statement that she was objecting as the "identity [i]s irrelevant to the medical examination" as preserving error on this issue. The State does not contest error preservation.

1494 (10th Cir. 1993)), and there is no categorical rule that admits identity statements to medical personal, *Smith*, 786 N.W.2d at 186–87. However, in *State v. Tracy*, 482 N.W.2d 675, 681–82 (Iowa 1992), our supreme court approved of the approach used by the Eighth Circuit in *United States v. Renville*, 779 F.2d 430, 436 (8th Cir. 1985), in which the court concluded that "statements by a child abuse victim concerning the identity of the abuser made to a physician during an examination are 'reasonably pertinent to diagnosis or treatment' where the abuser is a member of the victim's immediate household." As *Tracy* and *Renville* recognized, and as the nurse here testified, medical personnel "have an obligation to prevent 'an abused child from being returned to an environment in which he or she cannot be adequately protected from recurrent abuse.'" *Tracy*, 482 N.W.2d at 681 (quoting *Renville*, 779 F.2d at 438). Thus, "[i]nformation that the abuser is a member of the household is therefore 'reasonably pertinent' to a court of treatment which includes removing the child from the home." *Id.* at 681–82 (citation omitted).

"[T]he value of th[e] information is established by the foundational testimony of the doctors and medical providers in each case, and that testimony explains the pertinence of the perpetrator's identity to the diagnosis and treatment of the victim in the unique circumstances of each case." *Smith*, 876 N.W.2d at 187. Here, before testifying as to J.W.'s statement regarding the identity of the perpetrator, the nurse explained that she asks patients—especially young patients—if they can identify their assailant for the safety of the patient and to ensure that they have somewhere safe to return to once they are discharged.

Because the State—through the nurse's testimony—laid the foundation to establish that J.W.'s identification of the perpetrator fell within the hearsay

exception before the nurse testified about J.W.'s statement, the district court did not err in admitting the testimony.

### 2. Leading Objection.

McBride claims the district court abused its discretion when it allowed the prosecutor to ask J.W. a leading question during direct examination. We review this claim for an abuse of discretion, as the "trial court has considerable discretion in admitting or excluding answers to leading questions and there must be a clear abuse of discretion to justify a reversal." *Glitner v. Stark*, 219 N.W.2d 700, 706 (Iowa 1974).

To begin, we note McBride's complaint that the record is "replete" with leading questions asked of J.W. and that there were "many, many leading questions with a reluctant witness." However, McBride objected to only one such question, so it is the only one preserved for our review. *State v. Rutledge*, 600 N.W.2d 324, 325 (Iowa 1999) ("Nothing is more basic in the law of appeal and error than the axiom that a party cannot sing a song to us that was not first sung in trial court.").

Here, after J.W. had already testified that McBride had "hurt" her on her Labor Day and that she had talked to the police and gone to the hospital as a result to "[g]ive a rape kit," the following exchange took place:

> Q. The last time on Labor Day, [J.W.], do you remember what you were wearing that day? A. [No response.]
> Q. Did the police officers ask you—or did the nurse at the hospital ask you about what you were wearing that day? A. Yes.
> Q. And can you remember what you were wearing that day? A. Yes.
> Q. And what were you wearing? A. It was a pink tank top, some Victoria's Secret yoga pants and flower underwear.

The State then admitted into evidence pictures of the clothing officers had recovered from the home on Labor Day based on J.W.'s statement about what she was wearing that morning; J.W. identified the clothing to the jury as the same outfit she had described. Then the following exchange occurred:

> Q. [J.W.], can you tell us why the police would want to take the clothing that you were wearing, especially your underwear? A. [No response.]
> Q. Why would they want to take that? A. [No response.]
> Q. How come they didn't take any other clothing that you had? What was so special about that clothing? A. [No response.]
> Q. I know it's hard, [J.W.], but I need you to explain to the jury, who doesn't know anything about this case, what did you tell the police officers that made them want to take that clothing? Could you tell us that, please? A. [No response.]
> Q. Did you tell the police that you were wearing those clothes when [McBride] hurt you?
> DEFENSE COUNSEL: Objection. Leading.
> THE COURT: Overruled.
> A. [No response].

While McBride objects to this question as leading the witness, it seems more likely his issue was with counsel's assertion within the question that McBride had in fact "hurt" J.W. Nevertheless, we must consider his actual claim. "A question is objectionable as leading, when it suggests the answer to it, and not when it merely directs the attention of the witness to the immediate subject with reference to which he is interrogated." *Pelamourges v. Clark*, 9 Iowa 1, 9 (Iowa 1859). Pursuant to this definition, it is not clear from the record that the question was a leading question. Moreover, leading questions are allowed when "necessary to develop the witness's testimony." Iowa R. Evid. 5.611(c). With that in mind, we have recognized instances where leading questions may be proper on direct examination, such as when the witness "is of tender age" and when "the witness is testifying as to some form of sexual abuse." *State v. Mueller*, 344

N.W.2d 262, 266–67 (Iowa Ct. App. 1983) (citations omitted). And finally, J.W. did not respond to the complained-of question, so it is unclear what detriment McBride suffered from his objection being overruled.

Based on these circumstances, we cannot say the district court abused its broad discretion in allowing the one leading question to which McBride objected.

**C. Juror Bias.**

McBride maintains the district court abused its discretion when it denied his motion for new trial based on juror bias. *See State v. Webster*, 865 N.W.2d 223, 231 (Iowa 2015) ("We review a denial of a motion for a new trial based upon juror misconduct or juror bias for an abuse of discretion."). Here, McBride claims two jurors were biased, Juror S.S. and Juror W.B.

*1. Juror S.S.*

Although McBride claims he should have been granted a new trial because Juror S.S., who ultimately served as the alternate on his jury, indicated during voir dire that she was aware of serious allegations of sexual abuse perpetrated against her sister, McBride never attempted to strike Juror S.S. for cause. "Objections should be raised at the earliest time at which error became apparent in order to properly preserve error." *State v. Steltzer*, 288 N.W.2d 557, 559 (Iowa 1980). "Motion for new trial ordinarily is not sufficient to preserve error where proper objections were not made at trial." *Id.* "The purpose of such an error-preservation rule is to give notice to the court and opposing counsel at a time when corrective action is still possible." *State v. Milner*, 571 N.W.2d 7, 12 (Iowa 1997). Additionally, because Juror S.S. did not take part in jury deliberations and was no longer part

of the jury when it reached its verdict, McBride cannot establish prejudice. *See State v. Neuendorf*, 509 N.W.2d 743, 746 (Iowa 1993) ("In the absence of some factual showing that this circumstance resulted in a juror being seated who was not impartial, the existence of prejudice is entirely speculative.").

### 2. Juror W.B.

McBride maintains the district court should have granted his motion for new trial because it incorrectly refused to dismiss Juror W.B. for cause, which then required McBride to use a peremptory challenge to strike the juror.

In a recent case decided after McBride's trial, our supreme court ruled that when the district court abuses its discretion by improperly refusing "to disqualify a potential juror under Iowa Rule of Criminal Procedure 2.18(5)(k) and thereby causes a defendant to expend a peremptory challenge under rule 2.18(9), the defendant must specifically ask the court for an additional strike of a particular juror after his peremptory challenges have been exhausted." *State v. Jonas*, 904 N.W.2d 566, 583 (Iowa 2017). When the defendant does so, "prejudice will then be presumed." *Id.* However, "where a judge improperly denies a challenge for cause but the defendant does not specifically ask for an additional peremptory challenge of a particular juror after exhausting his peremptory challenges," *Neuendorf* remains good law. *Id.* Applying *State v. Neuendorf*, 509 N.W.2d 743, 746 (Iowa 1993), "[t]he search for legal prejudice must . . . focus on the potential for prejudice that flowed from forcing defendant to use a peremptory challenge on [the challenged juror] that might have been used to remove another juror." It is then up to the defendant to make "some factual showing that this circumstance

resulted in a juror being seated who was not impartial." *Neuendorf*, 509 N.W.2d at 746.

Here, even if we assume without deciding that the district court's denial of McBride's for-cause challenge was an abuse of discretion, McBride is not entitled to a new trial. First, as McBride did not have the benefit of the *Jonas* decision at the time of his trial, he did not ask for an additional peremptory challenge after his had been exhausted.[4] Thus, we apply the *Neuendorf* standard and do not presume prejudice. In order to obtain relief, McBride has the burden to establish "that the jury that did serve in the case was not impartial . . . based on matters that appear o[n] record." *Id.* at 474. And here, McBride has not even attempted to do so.

We cannot say the district court abused its discretion in denying McBride's motion for new trial based on juror misconduct.

### D. Pro Se Claims.

As we understand McBride's pro se appellate brief, his arguments are meant to, as he states, "reinforce the argument" of his attorney. Insofar as they have raised the same issues, we have already considered McBride's contribution to those claims in our analysis above. Additionally, although McBride has raised some additional claims in his pro se appellate reply brief, we do not consider such issues. *See Polk Cty. v. Davis*, 525 N.W.2d 434, 435 (Iowa 1994) ("An issue

---

[4] We are unconcerned that *Jonas* was decided after McBride's trial but before his appeal, as we apply the same test in either situation. Before *Jonas*, McBride had the burden to establish that his jury was not impartial to create a presumption of prejudice under *Neuendorf*. After *Jonas*, because McBride did not request the additional peremptory strike, we still apply the actual prejudice test of *Neuendorf*.

cannot be asserted for the first time in a reply brief. Substantial departures from appellate procedures cannot be permitted on the basis that a lay person is handling his own appeal.").

**III. Conclusion.**

Because substantial evidence supports both of McBride's convictions, he has not established that the district court wrongly decided his evidentiary objections, and the district court did not abuse its discretion in denying his motion for new trial on the basis of juror bias, we affirm.

**AFFIRMED.**